## GTE NORTHWEST INCORPORATED,
*Petitioner,*

*v.*

## PUBLIC UTILITY COMMISSION OF OREGON,
*Respondent,*

*and*

## MCI TELECOMMUNICATIONS CORPORATION,
*Intervenor-Respondent.*

(93-852; CA A81647)

883 P2d 255

Richard E. Potter argued the cause for petitioner. With him on the brief were Timothy J. O'Connell, James M. Brown and Enfield, Guimond, Brown & Collins.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Keith L. Kutler, Assistant Attorney General.

No appearance for intervenor-respondent MCI Telecommunications Corporation.

Before Warren, Presiding Judge, and Edmonds and Leeson, Judges.

EDMONDS, J.

## EDMONDS, J.

GTE Northwest, Inc. (GTE), challenges, under ORS 183.400, certain rules of the Public Utility Commission (PUC), adopted by Order No. 93-852,[1] requiring local

---

[1] The challenged rules are OAR 860-35-020(8), OAR 860-35-070(5) and OAR 860-35-110.

OAR 860-35-020(8) provides:

" 'Collocation' means a service, offered by a LEC, which provides for placement and installation of a customer's equipment, software, and databases on LEC premises. Premises include central offices, remote network facilities, or any other similar location owned by the LEC. The equipment, software, and databases are owned by the customer."

OAR 860-35-070(5) provides:

"Complete requests for collocation and virtual collocation shall be evaluated pursuant to the following requirements:

"(a) The LEC shall provide a written response to the customer within 45 days of receipt;

"(b) The LEC shall implement the request as soon as feasible and in any event no later than six months of the receipt of the request;

"(c) The LEC shall implement a request for collocation or virtual collocation by offering the service in tariffs or by special contract if there is sufficient space or capacity and all applicable requirements in OAR 860-35-080(5) and 860-35-110 are met."

OAR 860-35-110 provides, in part:

"(1) LECs shall offer collocation and virtual collocation to customers as provided in this rule.

"(2) Software and database collocation shall be limited to facilities designed for external applications such as rapid delivery platforms, service nodes, or memory partitions. All requests for software and database collocation must be approved by the Commission unless there is mutual agreement for such collocation between the LEC and the requesting customer.

"(3) A LEC shall require customers to meet the following collocation requirements:

"(a) Collocation space shall not be accessible by the general public. Customers shall comply with all reasonable security requirements of the LEC. Customers shall permit LEC personnel to enter and inspect collocation space upon 24 hour notice, and only in the presence of a customer representative, except that LEC personnel may immediately enter in the event of an emergency;

"(b) Customers shall be responsible for the installation, operation, and maintenance of its own equipment. LECs may offer installation, operation, and maintenance services to customers. Equipment compatibility shall be the responsibility of the customer;

"(c) Customers are required to maintain comprehensive general liability insurance, including protection against death, personal injury and property damage, issued by a company qualified to do business in Oregon, in an amount of not less than $1 million;

telephone exchange companies (LECs) to offer "collocation" to enhanced service providers (ESPs) located in their areas. We hold that the rules are valid.

The order in question adopted a regulatory framework known as Open Network Architecture (ONA). The order states that the adopted rules

"advanced two main policy goals: (1) to obtain efficient delivery of enhanced telecommunications services to the public, and (2) to achieve greater competitive equity between providers of telecommunications service."

---

"(d) Customers are required to indemnify the LEC in the event there is damage to LEC equipment or the LEC's security is compromised as a result of the customer's intentional misuse or negligence;

"(e) Customers shall request collocation in writing. The request shall specify technical and space requirements.

"(4) LECs shall meet the following collocation requirements:

"(a) If a customer has complied with all collocation requirements specified in this Division, the LEC shall permit the customer to collocate without regard to the technology employed by the customer;

"(b) A LEC shall maintain and control access to its facilities in accordance with industry standards for security and safety. A LEC shall permit access to a customer's collocated facilities by authorized representatives of the customer in accordance with said standards;

"(c) A LEC shall be required to indemnify the collocated customer against death, personal injury and property damage caused by the LEC's intentional misuse or negligence;

"(d) A LEC shall assign space for collocation on a first-come, first-served basis based on the date the LEC receives a collocation request. The LEC shall maintain records documenting requests for collocation;

"(e) In the event a LEC states it does not have sufficient space to allow for collocation and the customer disputes the LEC's assertion, the Commission's staff shall inspect the proposed point of collocation to verify that there is a lack of space. If the Commission's staff verifies that space is not available, the LEC shall deny collocation to the customer and offer the customer virtual collocation and CEI arrangements;

"(f) Expansion of the LEC's enhanced services operation shall not take precedence over existing written requests for collocation. In the event a LEC required space for basic services which is otherwise occupied by a customer, the LEC shall give the customer at least 12 months' written notice to vacate. Customers shall vacate on a last-in, first-out basis or as mutually agreed by all affected parties. Customers so forced to vacate shall be offered virtual collocation and CEI arrangements;

"(g) In the event it is necessary for a LEC to construct or modify existing space to collocate a customer, the LEC may require the customer to pay reasonable construction costs for the construction of segregated space in a LEC facility. Thereafter, the LEC may charge a monthly service charge for the use of the segregate space[.]"

ONA is concerned with two particular competitors, LECs and their ESP "customers."[2] For purposes of this case, GTE is an LEC. An LEC provides basic telecommunications services to its area, and can also provide "enhanced services" such as call forwarding or voice messaging. ESPs provide only enhanced services and must utilize the LEC's network to do so. In order to "achieve greater competitive equity" in the enhanced services market, the ONA requires LECs to allow each ESP to occupy a portion of the LEC's property for the ESP's equipment. This act is defined as "collocation" under OAR 860-35-110. An ESP may, in the alternative, request the LEC to obtain and place equipment on its premises for that particular ESP's needs. This act is called "virtual collocation," as defined by OAR 860-35-110, and it differs from collocation in that the LEC owns the equipment being used for the ESP. The ONA provides that the LEC is to be reimbursed for both types of collocation, and for all other ONA services, through its local exchange or interexchange tariffs. OAR 860-35-040; OAR 860-35-060.[3] On review, GTE does not challenge the rules regarding virtual collocation.

■■ GTE argues that the rules regarding collocation effect a "taking" under Article I, section 18, of the Oregon Constitution[4] and under the Fifth[5] and Fourteenth Amendments to the United States Constitution, and that PUC has

_____

[2] OAR 860-35-020(11) defines customer as "a subscriber, user, or consumer of LEC services or an applicant for LEC services."

[3] OAR 860-35-040(1) provides, in part:

"Tariff nomenclature and service descriptions for ONA services shall be as consistent as possible with those adopted by the Information Industry Liaison Committee (IILC). Each LEC shall maintain a separate section of either its local exchange or interexchange access tariffs containing a listing of all intrastate ONA services offered by the LEC, or shall maintain a separate ONA tariff containing such listing. The separate ONA section or tariff shall refer to appropriate tariff sections and price lists for each ONA service and include a compatibility matrix."

OAR 860-35-060(3) provides:

"Rates of collocation and virtual collocation may include elements for safety, security, floor space, power, maintenance and other relevant costs."

[4]

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; * * *."

[5]

"[N]or shall private property be taken for public use, without just compensation."

no statutory authority to "take" property. With regard to the "taking" issue, it makes only one argument: Collocation is a permanent physical occupation under the holding of *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982), and as such, "is a taking without regard to the public interests it may serve." 458 US at 426. *See also Ferguson v. City of Mill City*, 120 Or App 210, 214, 852 P2d 205 (1993). We begin our discussion by emphasizing that GTE's petition is limited to a facial challenge of the rules under ORS 183.400 and, therefore, we limit our consideration "to the face of the rule and the law pertinent to it." *AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992).

In order to determine whether collocation constitutes a permanent physical occupation, it is instructive to examine the holding in *Loretto v. Teleprompter Manhattan CATV Corp., supra*. That case arose out of a New York statute prohibiting a landlord's interference with the installation of cable television equipment[6] on her property, and the prohibition of any demand for payment by the landlord from either her tenants or the cable television company for the installation of the equipment. The statute also authorized the State Commission on Cable Television to set a reasonable fee for the cable television company to pay to the landlord for the use of her property.[7] The Court concluded that the statute's mandate constituted a permanent physical occupation, and was therefore, a *per se* taking under the United States Constitution. 458 US at 426. *See FCC v. Florida Power Corp.*, 480 US 245, 250, 107 S Ct 1107, 94 L Ed 2d 282 (1987).

■■ In making that determination, the Court reviewed the case law regarding "permanent physical occupation, on the one hand, and the cases involving a more temporary invasion * * * on the other." 458 US at 428. It said that cases involving a physical invasion "are special." 458 US at 432. It noted that, "[w]hen faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking." 458 US at 427. Thus, a permanent physical occupation authorized by

---

[6] The equipment in *Loretto* involved cables, directional taps and large silver boxes installed along some of the cables. 458 US at 422.

[7] Whether there was just compensation was not one of the issues on appeal.

state law constitutes a taking whether it is the state or a party authorized by the state who is the occupant. *Pumpelly v. Green Bay Co.*, 80 US (13 Wall) 166, 20 L Ed 557 (1872). A mere temporary invasion will not constitute a *per se* taking.

Although the Court in *Loretto* never clearly defines what is a permanent physical occupation, it does give examples of what it considers to be permanent invasions and temporary invasions. Examples of permanent physical invasions include the construction of a dam, which permanently flooded the owner's property, *Pumpelly v. Green Bay Co., supra*, the placement of telegraph poles on the city's public streets, *St. Louis v. Western Union Telegraph Co.*, 148 US 92, 13 S Ct 485, 37 L Ed 380 (1893), and the placement of telegraph lines over a railroad's right-of-way. *Western Union Telegraph Co. v. Pennsylvania R.R. Co.*, 195 US 540, 25 S Ct 133, 49 L Ed 312 (1904).

The Court also characterized a permanent physical occupation as a "property restriction of an unusually serious nature," because it effectively destroys the traditional property rights to possess property, exclude others from its use, and to use and to dispose of portions of one's property:

> "First, the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space. The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights. Second, the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others, but can make no non-possessory use of the property. Although deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, it is clearly relevant. Finally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." *Loretto v. Teleprompter Manhattan CATV Corp., supra*, 458 US at 435-36. (Citations omitted.)

Thus, when the owner forever loses the ability to exercise any of the above property rights, the Court considers the occupation to be permanent.

In contrast, temporary invasions include the construction of a temporary dam in a river to permit construction of a tunnel, which denied an owner access to his property, *Northern Transportation Co. v. Chicago*, 99 US 635, 25 L Ed 336 (1879), and requiring a shopping mall to allow individuals to exercise free speech and petition rights on property it held open to the public. *PruneYard Shopping Center v. Robins*, 447 US 74, 100 S Ct 2035, 64 L Ed 2d 741 (1980). In *PruneYard*, even though individuals were allowed physically to invade the owner's property, the owner could impose reasonable time, manner and place restrictions on the free speech activities. The Court reasoned that the owner's ability to impose such restrictions made the invasion "temporary and limited in nature." 458 US at 434. Thus, characteristics of a temporary occupation focus on the duration of the physical invasion and the owner's ability to control the extent of the invasion to some degree.

In this case, we agree with GTE that there may be a physical invasion if the rules are implemented against an LEC. The PUC requires LECs to allow a portion of their property to be used for collocation. The "placement of a fixed structure," the Court said in *Loretto*, "is an obvious fact [of physical occupation]." 458 US at 437. GTE argues that the rules effectively cause a permanent occupation. However, the occupation in this case is not "permanent" within the meaning of *Loretto*, because the LECs have some control over the extent and duration of the occupation. OAR 860-35-110(4)(f) requires the occupying ESP to vacate the space after at least 12 months' written notice, in the event that the LEC needs the space for basic services. Finally, OAR 860-35-110(4)(a) vests an LEC with some control when there is no existing space for collocation. Moreover, an LEC's ability to use its own property is not unfettered. In the abstract, no taking occurs if the interest that the utility claims is an interest it never had in the first instance. *See Northwest Gas Co. v. City of Portland*, 300 Or 291, 711 P2d 119 (1985). LECs are regulated heavily in the use of their property by the PUC.[8]

---

[8] For example, ORS 756.075 gives the PUC authority to enter an LEC's property for the purpose of examining the LEC's equipment and records, and to place its own equipment on the LEC's property for examination purposes. ORS 759.580 authorizes the PUC to require an LEC to use its property to provide service to a particular locality. ORS 759.375 substantially limits the LEC's ability to sell, lease,

*See Ruckelshaus v. Monsanto Co.*, 467 US 986, 104 S Ct 2862, 81 L Ed 2d 815 (1984);[9] *California Housing Securities, Inc. v. U.S.*, 959 F2d 955 (Fed Cir), *cert den* ___ US ___, 113 S Ct 324 (1992).[10] In that sense, the exercise of the PUC's authority to control the use of an LEC's property under its rules does not offend the traditional rights to possess property and to exclude others from the use of it. Thus, GTE's argument that the limitations on its use of its own property are unconstitutional necessarily requires a balancing of the interests between private property rights and governmental interests. As we have said, those kinds of tests are not applicable to a facial challenge made on the basis that there is a permanent physical invasion.

The ramifications of the rights that the LECs retain persuade us that the criteria required by *Loretto v. Teleprompter Manhattan CATV Corp., supra,* for a permanent "taking" have not been met. Whether a "taking" occurs because of a temporary invasion is not an issue we need decide in the light of petitioner's facial challenge. It follows that, the rules on their face do not violate Article I, section 18, or the Fifth and Fourteenth Amendments.[11]

In the light of this conclusion, we need not discuss GTE's other arguments.

Rules held valid.

---

assign, mortgage, encumber or otherwise dispose of its property without the PUC's approval.

[9] In *Ruckelshaus*, Monsanto was required to provide various trade secrets about chemical insecticides to the government as a predicate to being licensed to manufacture and sell the chemicals. The Court said that "such restrictions are the burdens we all must bear in exchange for 'the advantage of living and doing business in a civilized community.' " *Ruckelshaus v. Monsanto Co., supra,* 467 US at 1007.

[10] In *California Housing Securities, Inc. v. U.S., supra,* the Court held that the Department of Treasury's appointment of a conservator and receiver over a savings and loan institution was not a taking, because the savings and loan institution did not hold the property right pivotal to the *Loretto* holding, *i.e.,* the right to exclude. The Court found it significant that the plaintiff had never held the particular property right it complained of was taken. It had voluntarily applied for federal deposit insurance under a statute that allowed the government to appoint a receiver and conservator under certain situations. Thus, the plaintiff had no historically rooted expectation that it would be compensated for the department's action.

[11] GTE also argues that *Bell Atlantic Telephone Co. v. F.C.C.*, 24 F3d 1441 (DC Cir 1994), supports its challenge that collocation is a "taking" for which the PUC had no statutory authority to require. We disagree.