Argued and submitted March 8, decision of the Court of Appeals reversed
August 24, 1995

# GTE NORTHWEST INCORPORATED,
*Petitioner on Review,*

*v.*

# PUBLIC UTILITY COMMISSION OF OREGON,
*Respondent on Review,*

*and*

# MCI TELECOMMUNICATIONS CORPORATION,
*Intervenor-Respondent.*

## (PUC 98-852; CA A81647; SC S41791)

900 P2d 495

Richard E. Potter, Everett, Washington, argued the cause for petitioner on review. With him on the petition were Timothy J. O'Connell, Everett, Washington, and James M. Brown, of Enfield, Guimond, Brown & Collins, Salem.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Charles L. Best, Portland, filed a brief on behalf of *amicus curiae* U. S. West Communications, Inc.

Barbee B. Lyon and Michael M. Morgan, of Tonkon, Torp, Galen, Marmaduke & Booth, Portland, filed a brief on behalf of *amicus curiae* Oregon Independent Telephone Association.

Robert W. Childress, Portland, filed a memorandum on behalf of *amicus curiae* Portland General Electric Company.

Thomas H. Nelson, of Stoel Rives Boley Jones & Grey, Portland, filed a memorandum on behalf *amicus curiae* PacifiCorp.

GRABER, J.

## GRABER, J.

GTE Northwest, Inc., (GTE) challenges, under ORS 183.400,[1] certain rules adopted by the Public Utility Commission (PUC). For the following reasons, we hold that the challenged rules are invalid.

### I. FACTS AND PROCEDURAL BACKGROUND

In June 1993, the PUC adopted rules that created a regulatory framework for telecommunications, known as the Open Network Architecture (ONA). Those rules have been codified at OAR chapter 860, division 35.

As pertinent here, the ONA relates to two types of competitors in the telecommunications market — local exchange carriers (LECs) and enhanced service providers (ESPs). A single entity may be both an LEC and an ESP, depending on the services that it provides. *See* OAR 860-35-020(14) (defining ESPs). LECs provide basic telecommunications services within geographic boundaries established by the PUC. *See id.* at § (18) (defining LECs). "Basic services" are those services that "provide[] transmission capacity for the movement of information"; they include "data processing, computer memory or storage, switching techniques and other activities which facilitate the movement of information." *Id.* at § (4). ESPs provide "enhanced services." *Id.* at § (14). "Enhanced services" are those services that "employ[] computer processing applications that act on the format, content, code, protocol or similar aspects of the customer's transmitted information," provide customers with "additional, different, or restructured information," or

---

[1] ORS 183.400 provides in part:

"(1) The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. The court shall have jurisdiction to review the validity of the rule whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, but not when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court.

"* * * * *

"(4) The court shall declare the rule invalid only if it finds that the rule:

"(a) Violates constitutional provisions;

"(b) Exceeds the statutory authority of the agency; or

"(c) Was adopted without compliance with applicable rulemaking procedures."

"involve customer interaction with stored information." *Id.* at § (13). Enhanced services include "voice messaging" and "protocol translation between customer equipment or software." *Ibid.* ESPs provide only enhanced services and must utilize LECs' networks to do so. *Id.* at § (14). GTE is an LEC.

GTE objects to portions of the ONA that provide for "collocation." OAR 860-35-020(8) provides:

> " 'Collocation' means a service, offered by a[n] LEC, which provides for placement and installation of a customer's equipment, software, and databases on LEC premises. Premises include central offices, remote network facilities, or any other similar location owned by the LEC. The equipment, software, and databases are owned by the customer."

In particular, GTE challenges the validity of OAR 860-35-020(8), OAR 860-35-070(5), and OAR 860-35-110 (the last two of which are set out in the Appendix, in pertinent part). That aspect of the regulatory scheme of the ONA is complex but, for our purposes, may be summarized as follows.

The ONA requires an LEC to allow an ESP that complies with certain delineated procedures either to "collocate" or to "virtually collocate" on an LEC's property.[2] OAR 860-35-070(5); OAR 86-035-110(1). If an ESP chooses to collocate, an LEC must allow the ESP to occupy a portion of the LEC's property for the ESP's equipment. OAR 860-35-110(4). If an ESP chooses to virtually collocate, an LEC must obtain and place equipment on the LEC's property for that particular ESP's needs. OAR 860-35-110(5), (6). Virtual collocation differs from collocation in that, when virtual collocation occurs, the LEC owns the equipment being used by the ESP; by contrast, when collocation occurs, the ESP owns the equipment that is placed on the LEC's property. The ONA provides that the LEC is to be reimbursed for both collocation and virtual collocation. OAR 860-35-040; OAR 860-350-060.

---

[2] "Collocation" is defined by OAR 860-35-020(8), quoted in the text above.

"Virtual collocation" is defined by OAR 860-35-020(27) as

"a service, offered by a[n] LEC, which provides for placement and installation of customer selected equipment, software, and databases on LEC premises. Premises include central offices, remote network facilities, or any other similar location owned by the LEC. The equipment, software, and databases are owned and maintained by the LEC."

GTE challenges only the rules regarding collocation. GTE does not challenge the rules regarding virtual collocation or the adequacy of the compensatory aspect of the ONA.

■     GTE argues that the PUC lacked the statutory authority to promulgate the rules regarding collocation because, according to GTE, they constitute a physical invasion, and thus a taking under Article I, section 18, of the Oregon Constitution, and the Fifth and Fourteenth Amendments to the Constitution of the United States.[3] From that premise, GTE then argues that, because the PUC lacks the *express* eminent domain authority that is required before an agency may effect a taking, the rules are beyond the PUC's statutory authority, no matter how much compensation would be paid under them.

GTE brought a challenge to the collocation rules in the Court of Appeals under ORS 183.400. The Court of Appeals concluded that the challenged rules did not effect a taking and, thus, held that those rules were valid. *GTE Northwest, Inc. v. Public Utility Commission*, 130 Or App 637, 645, 883 P2d 255 (1994). For the reasons that follow, we reverse.

## II.  JUDICIAL REVIEW UNDER ORS 183.400

■     This case involves judicial review of an agency's rule under ORS 183.400, quoted above at note 1. Under ORS 183.400, the appellate court may declare a rule invalid if (1) the rule was adopted without compliance with applicable statutory procedures, (2) the rule exceeds the statutory authority of the agency, or (3) the rule violates a constitutional provision. ORS 183.400(4). ORS 183.400(3) provides:

"Judicial review of a rule shall be limited to an examination of:

---

[3] Article I, section 18, of the Oregon Constitution, provides in part:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation * * *."

The Fifth Amendment to the Constitution of the United States provides in part:

"[N]or shall private property be taken for public use, without just compensation."

The Takings Clause of the Fifth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Nollan v. California Coastal Comm'n*, 483 US 825, 827, 107 S Ct 3141, 97 L Ed 2d 677 (1987).

"(a) The rule under review;

"(b) The statutory provisions authorizing the rule;

"(c) Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures."

Judicial review of an agency's rule under ORS 183.400 is limited to a determination of whether the rule, as written, is valid:

"We emphasize at the outset the limited scope of the Court of Appeals' review (and ours) under ORS 183.400. Aside from questions that might arise concerning the facts surrounding the process of adopting a rule — questions not raised in this case — judicial review under ORS 183.400 is limited to the face of the rule and the law pertinent to it. Numerous individual fact situations can arise under any rule, but judicial review of the rule as applied to each of those situations is reserved to other forums. ORS 183.400(1). *See, e.g.,* ORS 183.482, ORS 183.484 (providing for judicial review of agency orders in various fact-specific situations). Petitioners' petition for review in this case refers to actions alleged to be occurring pursuant to the rules at issue here, but the legality of any particular application of the rules is premature, and not subject to review under ORS 183.400." *AFSCME Local 2623 v. Dept. of Corrections,* 315 Or 74, 79, 843 P2d 409 (1992).

In *AFSCME,* this court considered an ORS 183.400 challenge to a rule adopted by the Department of Corrections. That rule provided that an employee or volunteer could be asked to submit to a search "only when there is reasonable suspicion that the employee or volunteer is in possession of unauthorized property or contraband and that the search and seizure is necessary to substantiate the suspected violation." OAR 291-41-030(1). This court considered the petitioners' arguments concerning whether the Department had statutory authority to adopt rules that allowed such searches even when, as in this case, the rule applied only under certain built-in conditions precedent. *Id.* at 79-82. The court held that the challenged rules did not exceed the agency's statutory authority. *Id.* at 81-82. What was not subject to review was simply "actions alleged to be occurring pursuant to the rules at issue." *Id.* at 79.

As noted above, GTE challenges the portions of the PUC's rules that authorize collocation. OAR 860-35-110

requires an LEC to provide for collocation if certain conditions are satisfied. OAR 860-35-110(4)(e) provides in part:

> "In the event a[n] LEC states it does not have sufficient space to allow for collocation and the [ESP] disputes the LEC's assertion, the [PUC's] staff shall inspect the proposed point of collocation to verify that there is a lack of space. If the [PUC's] staff verifies that space is not available, the LEC shall deny collocation to the customer and offer the customer virtual collocation * * *."

The provision regarding insufficient space does not represent an application of the collocation rules in a particular fact situation, which would not be within our scope of review under *AFSCME*; rather, it is part of the rule itself. The rule, by its terms, requires collocation when, among other things, there is enough space. The question, then, is not whether the rule always requires collocation, but rather whether every collocation constitutes a taking. The exception to collocation for insufficient space is simply a built-in condition precedent to the application of the challenged rule, like reasonable suspicion in *AFSCME*. GTE does not challenge any "actions alleged to be occurring pursuant to the rules at issue," which *AFSCME* holds would be beyond our scope of review.[4]

■     Accordingly, review of the challenged rules is appropriate under ORS 183.400. GTE argues specifically that collocation is a taking and that the authorization of a taking exceeds the PUC's statutory authority, ORS 183.400(4)(b). Under that provision, we must "decide whether the promulgation of the regulation was within the jurisdictional authority of [the PUC]." *See Gilliam County v. Dept. of Environmental Quality*, 316 Or 99, 106, 849 P2d 500 (1993) (stating quoted standard), *rev'd on other grounds sub nom Oregon Waste Systems v. Dept. of Env. Quality*, 511 US ___, 114 S Ct 1345, 128 L Ed 2d 13 (1994).

*Gilliam County* and *AFSCME* instruct us first to consider the jurisdictional authority of the agency, by looking at the face of the rule and the law pertinent to it. We thus turn to whether the PUC has the authority to promulgate rules

---

[4] To the extent that the present case is methodologically inconsistent with *AFSCME*, hereafter we will follow the analysis provided here.

that effect a taking within the meaning of the Oregon Constitution. It is logical to begin with that inquiry because, if the PUC has the power to promulgate rules that effect a taking, it matters not whether the underlying premise of GTE's argument (that the challenged rules effect a taking) is correct, and we would need to proceed no further.

## III. AGENCY'S AUTHORITY TO EFFECT A TAKING

GTE argues that the PUC is without authority to engage in acts, including rulemaking, that effect a taking. GTE's argument is premised on the assertion that *express* eminent domain authority is required before a state agency may take property for a public purpose. GTE is correct.

■ "Eminent domain is the power inherent in a sovereign state of taking or of authorizing the taking of any property within its jurisdiction for a public use or benefit." *Dept. of Trans. v. Lundberg*, 312 Or 568, 571 n 1, 825 P2d 641 (internal quotation marks omitted; citation omitted), *cert den* 506 US ___, 113 S Ct 467, 121 L Ed 2d 374 (1992). This court has repeatedly and consistently held that "the right of eminent domain * * * can be exercised only by legislative authority." *B.V.L. Co. v. Johnson*, 30 Or 205, 208, 46 P 790 (1896). The legislature may delegate its power of eminent domain to an administrative agency, but it must do so expressly.

> "Eminent domain is vested in the state. This power may be delegated by it to its *subordinate agencies*, but he who would exercise such sovereign right of taking another person's property * * * *must be able to point out express statutory authority. It will not be implied*[.]" *Smith v. Cameron et al.*, 123 Or 501, 504, 262 P 946 (1928) (emphasis added).

See also *Emerald PUD v. PP&L*, 302 Or 256, 263, 729 P2d 552 (1986) (concluding that a state agency had the power to act in eminent domain when the statute "clearly" granted that power to the agency); *Tomasek v. Oregon Highway Com'n*, 196 Or 120, 142, 248 P2d 703 (1952) ("Though the power of eminent domain is inherent in the state, it lies dormant until called into existence by *express legislative authority*.") (emphasis added); *State ex rel. v. Hawk et al.*, 105 Or 319, 325, 327, 208 P 709 (1922) ("The power of eminent domain is inherent in the state, yet it lies dormant until called

into exercise by *express legislative authority*[.] * * * [S]tatutes providing for condemnation should be strictly construed." (emphasis added)).

The PUC does not disagree with the foregoing principle. Rather, the PUC argues for a limitation on its application:

"The requirement of eminent domain power exists to protect public funds from being used to buy property by agencies that have no authorization to purchase it."

The PUC asserts that that policy concern is not invoked by the collocation rules, because under those rules there

"is no fiscal exposure to PUC, nor is there any other risk to public funds. * * * The regulatory structure * * * not only provides compensation, it provides for judicial review to determine whether that compensation is adequate and fair. In short, compensation for the collocation services that a[n] LEC may be required to provide is built into the rates paid by the collocators." (Citations omitted.)

The PUC's argument is that, when a government agency acts in eminent domain and takes private property for public use, but when compensation for that taking does not come directly from the public treasury, the agency needs no specific grant of authority so to act.

The PUC points to no cases from this jurisdiction, nor are we aware of any, that support that view. The PUC's argument reads into this court's prior cases a rationale and, thereby, a limitation, that those cases do not contain. The cases cited above establish a bright-line rule: that an agency may not act in eminent domain without an express grant of power from the legislature. It is up to the legislature, not the PUC or any other administrative agency, to determine how those powers should be exercised. The legislature's reasons for granting or refusing to grant an administrative agency the power to act in eminent domain may include a desire to refrain from depleting the public fisc. However, the legislature's decision may also be rooted in a number of other policy considerations.

In the alternative, the PUC argues that the legislature has expressly given it the necessary eminent domain authority over telecommunications providers. It cites ORS

183.335, 756.060, and ORS chapter 759. ORS 183.335 concerns the notice that an agency must give prior to rulemaking. ORS 756.060 contains a general grant of rulemaking authority to the PUC. ORS chapter 759 delineates the authority and powers of the PUC. Although sections of that chapter do give the PUC broad regulatory and rulemaking authority, *see, e.g.*, ORS 759.580 (authorizing the PUC to require telecommunications utilities to offer services to a locality not already served), no section of that chapter contains an express grant of authority to the PUC to act in eminent domain generally or in regard to an LEC's property.[5]

■ In summary, the power of eminent domain may be exercised by an agency only if the agency has express statutory authority. The PUC does not have express statutory authority to promulgate rules that would effect a taking of an LEC's facilities. Accordingly, we next consider whether the challenged collocation rules do, in fact, effect a taking.

## IV. TAKINGS ANALYSIS

■ GTE argues that collocation is a physical invasion and, thus, a taking under the holding of *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 102 S Ct 3164, 73 L Ed 2d 868 (1982).[6] For the following reasons, we agree.

In *Loretto*, a property owner challenged a New York statute that prohibited the property owner from interfering with cable television facilities installed on her property. That statute also prohibited the property owner from demanding payment from any tenant or cable television company for the use of those facilities, except for a one-time, one dollar payment. 458 US at 421-25. The Court held that the challenged

---

[5] The legislature has granted the PUC the power to act in eminent domain in circumstances not presented here. The PUC can condemn property along public roads within the corporate limits of any municipal corporation for the location of telephone lines and telephone poles. ORS 759.080. The PUC does not contend that ORS 759.080 provides authority for the challenged rules.

[6] *Loretto* was decided under the federal constitution. GTE offers no separate analysis under the state constitution. Accordingly, we assume, without deciding, that the analysis is the same under Article I, section 18, of the Oregon Constitution, and the Takings Clause of the Fifth Amendment to the Constitution of the United States. *See Dept. of Trans. v. Lundberg*, 312 Or 568, 572 n 4, 825 P2d 624 (stating that principle), *cert den* 506 US ___, 113 S Ct 467, 121 L Ed 2d 374 (1992).

statute, as applied to the property owner in *Loretto*, constituted a taking. *Id.* at 441.

■ The Court started its analysis by noting that it has no standard formula for determining when governmental interference with property constitutes a taking. *Id.* at 426. The Court stated, however, that a " 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government." *Ibid.* The Court concluded that, "when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred." *Ibid.* If the nature of the governmental intrusion amounts to a "permanent physical occupation of property," the inquiry ends, regardless of "whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434-45.

The Court in *Loretto* did not engage in a detailed discussion of what constituted a physical invasion. The Court resolved the question before it by stating that the

"placement of a fixed structure on land or real property is an obvious fact that will rarely be subject to dispute. Once the fact of occupation is shown, of course, a court should consider the *extent* of the occupation as one relevant factor in determining the compensation due. For that reason, moreover, there is less need to consider the extent of the occupation in determining whether there is a taking in the first instance." *Id.* at 437-38 (emphasis in original; footnote omitted).

In that case, the cable television facilities on the property owner's property "involved a direct physical attachment" to the property. *Id.* at 438. It was, therefore, a physical invasion.

In *Loretto*, the Court explicitly rejected the argument that, because the challenged statute applied only to rental property, "the law is simply a permissible regulation of the use of real property." *Id.* at 439. "So long as the property remains residential and a [cable television] company wishes to retain the installation, the landlord must permit it." *Ibid.* The Court noted, in particular, that if the challenged statute

"required landlords to provide cable installation if a tenant so desires, the statute might present a different question from the question before us, since the landlord would own the installation. *Ownership would give the landlord rights to the placement, manner, use, and possibly the disposition of*

*the installation. The fact of ownership is * * * not simply incidental; it would give a landlord (rather than a [cable television] company) full authority over the installation except only as government specifically limited that authority.*" *Id.* at 440 n 19 (internal quotation marks omitted; citation omitted; emphasis added).

In *FCC v. Florida Power Corp.*, 480 US 245, 107 S Ct 1107, 94 L Ed 2d 282, (1987), the Court clarified its holding in *Loretto*. In *Florida Power*, a utility company challenged a decision of the Federal Communications Commission (FCC), made under a federal statute, which regulated the rates that the utility company could charge to cable television companies for running television cables on the utility company's poles. 480 US at 247-50. The Court rejected the argument that the rate regulations constituted a permanent physical invasion and that *Loretto* applied to the facts in *Florida Power*. *Id.* at 250. The Court distinguished the facts in *Florida Power* from the facts in *Loretto* as follows:

> "[W]hile the statute we considered in *Loretto* specifically *required* landlords to permit permanent occupation of their property by cable companies, nothing in the [federal statute] as interpreted by the FCC in these cases gives cable companies any right to occupy space on utility poles, or prohibits utility companies from refusing to enter into * * * agreements with cable operators. The [federal statute] authorizes the FCC * * * to review the rents charged by public utility landlords who have voluntarily entered into leases with cable company tenants renting space on utility poles. As we observed in *Loretto*, statutes regulating the economic relations of landlords and tenants are not *per se* takings. 'So long as these regulations do not *require* the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to non-possessory governmental activity.' *Loretto, supra*, at 440 (emphasis added).
>
> "This element of required acquiescence is at the heart of the concept of occupation. As we said in *Loretto*:
>
>> " '[P]roperty law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property. To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury. Furthermore, such an occupation is qualitatively more severe than a regulation

of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion.' 458 US, at 436 (citation omitted).

"Appellees contend, in essence, that it is a taking under *Loretto* for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79. But it is the invitation, not the rent, that makes the difference. The line which separates these cases from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license." 480 US at 251-253 (emphasis in original; footnote omitted; some citations omitted).

Recently, in *Yee v. Escondido*, 503 US 519, 112 S Ct 1522, 118 L Ed 2d 153 (1992), the Court further clarified what constitutes a physical invasion. In *Yee*, owners of a mobile home park challenged a rent control ordinance, arguing that the ordinance was a physical invasion and, thus, a taking. The owners objected to certain provisions in the ordinance that prevented them from determining to whom they could rent and how much they could charge their tenants. 503 US at 526-27. They argued that the challenged ordinance "has transferred a discrete interest in land — the right to occupy the land indefinitely at a sub-market rent — from the park owner to the mobile home owner." *Id.* at 527. The owners saw that interest as "no less than a right of physical occupation of the park owner's land." *Ibid.*

The Supreme Court rejected that argument:

"The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land. * * * Thus whether the government floods a landowner's property or does no more than require the landowner to suffer the installation of a cable, the Takings Clause requires compensation if the government authorizes a compelled physical invasion of property." *Ibid.* (emphasis in original; citations omitted).

The Court then noted that, in *Yee*, the owners were not compelled,

"once they have rented their property to tenants, to continue doing so. * * * [The statute] provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with six or twelve months notice. Put bluntly, no government has required any physical invasion of petitions'

property. *Petitioners' tenants were invited by petitioners, not forced upon them by the government.*" *Id.* at 527-28 (citation omitted; emphasis added).

The Court explicitly stated that a *"different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.*" *Id.* at 528 (emphasis added). The Court repeatedly emphasized that distinction. *See id.* at 531 ("Because [the owners of the mobile home park] voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals"); *id.* at 532 (quoting *Florida Power*, 480 US at 252, " 'it is the invitation, not the rent, that makes the difference' ").

In the present case, collocation "can be characterized as a physical invasion by [the] government," *Loretto*, 458 US at 426, for three reasons. First, collocation by definition involves the "installation of a[n ESP's] equipment, software, and databases on LEC premises." OAR 860-35-020(8). That is, by definition, collocation involves the "placement of a fixed structure on [the] land or real property" of an LEC. *Loretto*, 458 US at 437. Under the collocation rules, an LEC is required to accept a "direct physical attachment" to the property. *Id.* at 438. A "direct physical attachment," under *Loretto*, constitutes a physical invasion.

The second reason why collocation constitutes a physical invasion is that, under the rules, it is the ESP, not the LEC, that owns the equipment placed on the LEC's property. OAR 860-35-020(8) provides that, in collocation, "the equipment, software, and databases are owned by the [ESP]." As discussed above, the Court in *Loretto* relied on whether the property owner, or a third party, owned the cable boxes in deciding whether a physical invasion had occurred. The Court indicated that the outcome in *Loretto* might have been different had Loretto, and not the cable television company, owned the cable boxes. *See Loretto*, 458 US at 440 n 19 ("[t]he fact of ownership is * * * not simply incidental") (internal quotation marks omitted; citation omitted).

■   The third reason why collocation constitutes a physical invasion is that the rules *require* an LEC to provide collocation to an ESP that requests collocation. OAR

860-35-110(4)(a) provides that LECs "*shall* permit [an ESP] to collocate" if the ESP "has complied with all collocation requirements specified in [OAR ch 860, division 35]." (Emphasis added.) *See also* OAR 860-35-070(5)(b) (providing that "[t]he LEC shall implement [a request for collocation] as soon as feasible and in any event no later than six months of the receipt of the request"). Our discussion of *Florida Power* and *Yee* demonstrate that, when a statute *requires* a property owner "to suffer the physical occupation of a portion of his building by a third party," a physical invasion has occurred. "This element of required acquiescence is at the heart of the concept of occupation." *Florida Power*, 480 US at 252. Collocation thus makes ESPs that receive collocation "interloper[s] with * * * government license[s]," rather than "commercial lessee[s]." *Id.* at 253.

The Court of Appeals concluded that, even if collocation constitutes a physical invasion, that invasion "in this case is not 'permanent' within the meaning of *Loretto*, because the LECs have some control over the extent and duration of the occupation." 130 Or App at 644. The Court of Appeals concluded that the invasion constituted a "temporary" taking. *Ibid.* That argument misreads the Supreme Court's "physical invasion" jurisprudence. The *duration* of the "taking" by physical invasion is not relevant to the determination of whether a "taking" has occurred.

In determining the scope of the PUC's authority in this case, the issue is not whether the taking is permanent or temporary. Rather, the issue is whether the PUC has the authority, in this instance, to promulgate rules that effect any taking at all. As already noted, the PUC lacks that authority.

The PUC next argues that, even if the collocation rules effect a physical invasion, *Loretto* is not applicable to the facts of this case for two reasons. First, the PUC asserts that the interest allegedly taken is not one that the property owner had in the first place. The PUC reasons that, because LECs lack the power to exclude the PUC from their property, *see* ORS 756.075 (providing that the PUC or its representatives may enter any premises or facilities occupied by any public utility to make any inspection, examination or test reasonably required by the PUC to carry out its public duties), and because public utilities are restrained in how they make use of

their property, *see* ORS 759.375 (providing that public utilities cannot sell or otherwise dispose of assets used to serve the public without first obtaining the PUC's approval), LECs lack a "historically rooted expectation of compensation." The PUC reasons that, because of those restraints, LECs never had the right to exclude the PUC occupier in the first place and, therefore, the occupation is not a taking.

██ ██ The PUC's argument is inconsistent with *Loretto*. There, the Court stated:

"This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. *In none of these cases, however, did the government authorize the permanent occupation of the landlord's property by a third party*. Consequently, our holding today in no way alters the analysis governing the State's power to require landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of a building. *So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party*, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity." 458 US at 440 (citations omitted; footnote omitted; emphasis added).

In other words, the facts that an industry is heavily regulated, and that a property owner acquired the property knowing that it is heavily regulated, do not diminish a physical invasion to something less than a taking. Additionally, the fact that government itself regulates the industry, and therefore invades some of the property owner's traditional property rights, does not permit the government to allow a physical invasion by a third party.[7]

---

[7] In another passage in *Loretto*, the Court stated:

"Moreover, an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property. * * * [P]roperty law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property. To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury. Furthermore, such an occupation is qualitatively more severe than a regulation of *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion." 458 US at 436 (emphasis in original; citations omitted).

The PUC also argues that it could prevent GTE and other LECs from placing their own enhanced service equipment in their basic service plants, if that were necessary to promote viable competition between LECs and ESPs.[8] From that premise, the PUC concludes that it may, as a condition of permitting an LEC to locate its own enhanced service equipment in its network, require an LEC to permit competitors to locate there as well. That is, the PUC argues that, when the state has the power to forbid a particular use of property, it may, as the price of permitting that use, require the owner to submit to *a physical invasion* of that property as long as there is a substantial nexus between the governmental purpose and the invasion.

In support of that argument, the PUC relies on *Nollan v. California Coastal Comm'n*, 483 US 825, 107 S Ct 3141, 97 L Ed 2d 677 (1987). In *Nollan*, the California Coastal Commission required a beach front property owner to give the public access to the dry sand area of beach bordering the property, in exchange for the right to build a house that would block the view of that beach to passersby. Thus, the state attempted to regulate the Nollans' use of their property and to condition the receipt of a building permit on compliance with those regulations. 483 US at 827-31. The California Coastal Commission defended its action on the ground that, along with other houses built along the shore, the new house would interfere with visual access to the beach and create a "psychological barrier" to access.

---

In that passage, the Court reasserts that a third party's invasion of a property owner's property is of special significance in determining whether a physical invasion has occurred.

[8] PUC cites ORS 759.015 in support of that proposition. That statute provides:

"The Legislative Assembly finds and declares that it is the goal of the State of Oregon to secure and maintain high-quality universal telecommunications service at just and reasonable rates for all classes of customers and to encourage innovation within the industry by a balanced program of regulation and competition. The Commission shall administer the statutes with respect to telecommunications rates and services in accordance with this policy."

We assume, without deciding, that that statute grants to the PUC the power to prohibit LECs from placing their own enhanced service equipment in their basic service plants.

*Id.* at 838. The Commission argued that the public easement it decreed would provide "lateral access." *Ibid.*

The Court rejected the Commission's argument, because there was no rational nexus between the harm the Commission found, lack of visual access, and the relief it ordered, physical access along the beach. In reaching that conclusion, the Court made the following statement, on which the PUC relies:

> "The Commission argues that a permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking. We agree. Thus, if the Commission attached to the permit some condition that would have protected the public's ability to see the beach notwithstanding construction of the house * * * so long as the Commission could have exercised its police power (as we assume it could) to forbid construction of the house altogether, imposition of the condition would also be constitutional. Moreover (and here we come closer to the facts of the present case), the condition would be constitutional even if it consisted of the requirement that the Nollans provide a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere." *Id.* at 836.

The PUC errs by seeking to apply *Nollan's* "regulatory takings" analysis to a "physical invasion" case. The two are quite different. In *Yee*, the Court explained the distinction as follows:

> "Most of our cases interpreting the [Takings] Clause fall within two distinct classes. Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. See, *e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires the courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions." 503 US at 522 (citation omitted).

The present case involves the state's direction to the landowner to permit placement of a third party's property on the property of the landowner. The Supreme Court's takings cases clearly distinguish between physical invasions and regulations; the PUC cites the inapplicable line of regulation-related cases.

The PUC's attempts to distinguish *Loretto* are not convincing. The challenged collocation rules effect a taking under *Loretto*.

## CONCLUSION

The challenged collocation rules promulgated by the PUC would effect a taking. The PUC lacks authority to make rules that effect a taking. Accordingly, the PUC exceeded its statutory authority when it promulgated those rules. Pursuant to ORS 183.400(4)(b), we declare those rules to be invalid.

The decision of the Court of Appeals is reversed. OAR 860-35-020(8), OAR 860-35-070(5), and OAR 860-35-110 are invalid insofar as they provide for collocation by an enhanced service provider on a local exchange carrier's property.

## APPENDIX

### OAR 860-35-070(5) provides:

"Complete requests for collocation and virtual collocation shall be evaluated pursuant to the following requirements:

"(a)   The LEC shall provide a written response to the customer within 45 days of receipt;

"(b)   The LEC shall implement the request as soon as feasible and in any event no later than six months of the receipt of the request;

"(c)   The LEC shall implement a request for collocation or virtual collocation by offering the service in tariffs or by special contract if there is sufficient space or capacity and all applicable requirements in OAR 860-35-080(5) and 860-35-110 are met."

### OAR 860-35-110 provides in part:

"(1)   LECs shall offer collocation and virtual collocation to customers as provided in this rule.

"(2)   Software and database collocation shall be limited to facilities designed for external applications such as rapid delivery platforms, service nodes, or memory partitions. All requests for software and database collocation must be approved by the Commission unless there is mutual agreement for such collocation between the LEC and the requesting customer.

"(3)   A[n] LEC shall require customers to meet the following collocation requirements:

"(a)   Collocation space shall not be accessible by the general public. Customers shall comply with all reasonable security requirements of the LEC. Customers shall permit LEC personnel to enter and inspect collocation space upon 24 hour notice, and only in the presence of a customer representative, except that LEC personnel may immediately enter in the event of an emergency;

"(b)   Customers shall be responsible for the installation, operation, and maintenance of its own equipment. LECs may offer installation, operation, and maintenance services to customers. Equipment compatibility shall be the responsibility of the customer.

"(c)   Customers are required to maintain comprehensive general liability insurance, including protection against

death, personal injury and property damage, issued by a company qualified to do business in Oregon, in an amount of not less than $1 million;

"(d)   Customers are required to indemnify the LEC in the event there is damage to LEC equipment or the LEC's security is compromised as a result of the customer's intentional misuse or negligence;

"(e)   Customers shall request collocation in writing. The request shall specify technical and space requirements.

"(4)   LECs shall meet the following collocation requirements:

"(a)   If a customer has complied with all collocation requirements specified in this Division, the LEC shall permit the customer to collocate without regard to the technology employed by the customer;

"(b)   A[n] LEC shall maintain and control access to its facilities in accordance with industry standards for security and safety. A[n] LEC shall permit access to a customer's collocated facilities by authorized representatives of the customer in accordance with said standards;

"(c)   A[n] LEC shall be required to indemnify the collocated customer against death, personal injury and property damage caused by the LEC's intentional misuse or negligence;

"(d)   A[n] LEC shall assign space for collocation on a first-come, first-served basis based on the date the LEC receives a collocation request. The LEC shall maintain records documenting requests for collocation;

"(e)   In the event a[n] LEC states it does not have sufficient space to allow for collocation and the customer disputes the LEC's assertion, the Commission's staff shall inspect the proposed point of collocation to verify that there is a lack of space. If the Commission's staff verifies that space is not available, the LEC shall deny collocation to the customer and offer the customer virtual collocation and CEI arrangements;

"(f)   Expansion of the LEC's enhanced services operation shall not take precedence over existing written requests for collocation. In the event a[n] LEC requires space for basic services which is otherwise occupied by a customer, the LEC shall give the customer at least 12 months' written notice to vacate. Customers shall vacate on a last-in, first-out basis or as mutually agreed by all affected parties. Customers so

forced to vacate shall be offered virtual collocation and CEI arrangements;

"(g)   In the event it is necessary for a[n] LEC to construct or modify existing space to collocate a customer, the LEC may require the customer to pay reasonable construction costs for the construction of segregated space in a[n] LEC facility. Thereafter, the LEC may charge a monthly service charge for the use of the segregated space;

"(h)   LECs shall permit customers to monitor, test, and control the customer's collocated equipment either on site or remotely;

"(i)   LECs shall permit a customer to transmit information, including signaling and protocols, through the LEC's network without interference or manipulation;

"(j)   To the extent that a[n] LEC provides enhanced services by means of computer software operating in a processor external to its central office switches, the LEC shall make available to customers the same interfaces which the LEC uses to enable communications between its switches and such external processor."