Argued and submitted July 15, reversed and remanded December 7, 1994

## BOISE CASCADE CORPORATION,
a Delaware corporation,
*Appellant,*

*v.*

## BOARD OF FORESTRY,
*Respondent.*

(93-2018; CA A79626)

886 P2d 1033

Phillip D. Chadsey argued the cause for appellant. With him on the briefs was Stoel Rives Boley Jones & Grey.

Virginia L. Linder, Solicitor General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and John T. Bagg, Assistant Attorney General.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Plaintiff appeals from the judgment for defendant Board of Forestry (board) in this inverse condemnation action arising out of the board's refusal to permit logging operations on plaintiff's property in which a spotted owl nesting site is located. Plaintiff contends that the board's refusal gives rise to an uncompensated taking of its property in violation of the Fifth Amendment to the federal constitution and Article I, section 18, of the Oregon Constitution. The trial court granted the state's ORCP 21 motion to dismiss on the grounds that the court lacked subject matter jurisdiction, that the action was not ripe and that plaintiff's complaint[1] failed to state takings claims. We disagree with the trial court that the motion to dismiss was properly granted on any of those grounds, and we reverse and remand.

■ For purposes of reviewing the granting of a motion to dismiss for failure to state a claim under ORCP 21A(8), we take as true the allegations in the complaint, along with any facts that might be adduced to prove the allegations. *Doyle v. Oregon Bank*, 94 Or App 230, 232, 764 P2d 1379 (1988), *rev den* 307 Or 571 (1989).[2] With two exceptions that we will discuss below, the state accepts the statement of facts in plaintiff's opening brief as adequately summarizing the complaint. Accordingly, we take the facts that are material to our discussion from plaintiff's statement:

> "Boise Cascade has been the owner of real property in Clatsop County, consisting of approximately 65 acres of commercial timberland, which is known as the 'Walker Creek Unit' * * *. The Walker Creek Unit is the only commercial timberland that plaintiff owns in Clatsop County.

---

[1] We use the generic term "complaint" to refer to the supplemental complaint on which the parties ultimately proceeded.

[2] Although the allegations in the complaint do not play the same definitive role with respect to the jurisdictional issue, *see* ORCP 21A(1), the facts concerning it are undisputed, and it is resolvable solely on legal grounds. Ripeness issues fall in a gray area, in that they are not jurisdictional, and they are *usually* presented as matters of defense. However, the ripeness contentions presented here turn in part on a purely legal question and in part on factual questions that cannot be conclusively answered on the basis of this record—whether inside the complaint or out. It is unnecessary for us to decide whether we may look beyond the complaint to resolve the state's ripeness arguments because, at this stage of the case, they fail whether or not we do.

"In October 1988, Boise Cascade acquired the Walker Creek Unit. At that time and all times since, it has been zoned as commercial timberland. The Walker Creek Unit also cannot be developed or used for a commercial purpose that is not authorized by Land Conservation and Development Commission Goal 4 governing forestlands. OAR 660-06-000, et seq. That goal limits commercial activities on such lands to forest operations related to the growing and harvesting of any tree species as defined in ORS 527.620(6) and certain locationally dependent or compatible forest uses. Consistent with that goal, ORS 527.630(1) provides, in part, that 'it is declared to be the public policy of the State of Oregon to encourage economically efficient forest practices that assure the continuous growing and harvesting of forest tree species and the maintenance of forestland for such purposes as the leading use on privately owned land * * *.' At the time plaintiff acquired the subject property and at all times since, the Oregon Threatened or Endangered Wildlife Species Act, (ORS 496.192(1)), has provided, in part, that it was not intended 'to require an owner of any commercial forestland or other private land to take action to protect a threatened species or endangered species, or to impose additional requirements or restrictions on the use of private land.'

"Plaintiff acquired the Walker Creek Unit with the reasonable economic expectation that it could log the existing merchantable timber on the property and replant it with forest tree species in order to provide future merchantable timber harvests from the unit. The existing merchantable timber on the Walker Creek Unit consists of old and second growth Douglas Fir, Western Red Cedar, and Western Hemlock.

"In August 1990, the Oregon State Forester adopted an interim spotted owl policy precluding timber harvest within a 70-acre core area 'of the best available suitable habitat in the vicinity of the [nest] site.' Also in 1990, a pair of spotted owls were found nesting on a tree within the Walker Creek unit. Old growth timber of the kind found on the Walker Creek Unit is considered to be the best suitable habitat for spotted owls. The Board subsequently adopted OAR 629-24-809, which requires protection of a 70-acre core area of suitable habitat encompassing the nest site.

"Commercial timberland, consisting of trees that are 70 years or less in age, is not considered to be the 'best' suitable owl habitat if old growth timber is also available in the

vicinity of the nest site. In addition to the pair in the Walker Creek Unit, a number of other pairs of spotted owls have been found in Clatsop County. Some of those nest on State of Oregon-owned timberland that does meet the habitat requirements of OAR 629-24-809. Spotted owls have been found in 50- to 60-year old timber in the Buster Creek drainage in Clatsop County. Several pairs of spotted owls have been found in the Jewell area, which is approximately four air miles from the Walker Creek Unit. Spotted owls, including juveniles when they fledge, will often fly 20 miles or more in order to find new suitable habitat.

"On January 7, 1992, plaintiff filed Notification No. 92-521-11022 giving notice to the Oregon State Forester of its intent to conduct an operation and harvest timber on the Walker Creek Unit. Because of the location of protected waters on or near the Walker Creek Unit and the Walker Creek Unit's identification as spotted owl habitat, a written logging plan was required. Plaintiff filed such a plan on February 4, 1992. The plan provided that, if a pair of owls nested in the operations area in 1992, no operation would be conducted during the critical period of use, March 1 to September 30, or until the young owls had fledged, in order to avoid any incidental harm to the owls while they were present in the area. That plan was denied approval on February 24, 1992, on the ground that it failed to describe how the operation would be conducted to provide a 70-acre core area of suitable owl habitat consistent with the requirements of OAR 629-24-809.

"On May 5, 1992, plaintiff submitted an amended written logging plan. The amended plan reported that a pair of spotted owls was then known to be nesting in a tree within the harvest area, although it was a different site from the one that had been occupied by a pair of owls in 1990. The amended plan provided that plaintiff would not conduct operations in the area while the owls were present. With respect to the habitat identification requirement, the amended plan specifically provided that there were more than 70 acres of commercial timberland immediately adjacent to the Walker Creek Unit that were owned by the State of Oregon and that could provide habitat for the owls after plaintiff's property had been logged. Except for the subject timber which plaintiff desires to log, there is not sufficient 'suitable spotted owl habitat,' as defined by OAR 629-24-809-(1)(a), in the immediate area of the Walker Creek Unit to meet the requirements of that statute. Further, the only

known nest trees in the immediate area of the Walker Creek Unit to meet the requirements of that area are located within the unit which plaintiff desires to log. On May 15, 1992, approval of the amended plan was denied. In denying plaintiff's amended plan, the Oregon Department of Forestry identified the core areas consisting of approximately 56 acres of plaintiff's unit, nine acres of another private landowner's timber, and approximately five acres of adjacent timberland owned by the State of Oregon. The Oregon Department of Forestry did advise plaintiff that there were eight acres in its Walker Creek Unit that could be harvested.

"Plaintiff then took a timely appeal of the Oregon Department of Forestry's denial of its amended plan to the Board. As a basis for that appeal, plaintiff claimed that the Board's requirement that plaintiff set aside any part of its merchantable timber, including the nest trees, for spotted owl habitat constituted a taking of such property for a public purpose which requires just compensation under Article I, section 18, to the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. After a contested case hearing was held, on January 6, 1993, the Board refused to waive the 70-acre nest site requirement in order to permit plaintiff to log its Walker Creek Unit, and on January 15, 1993, it entered a final order which affirmed the denial of plaintiff's amended plan. The denial of plaintiff's written plan by the Board was a final administrative action prohibiting plaintiff from logging the subject timber.

"The timber, including the two nest trees, on the Walker Creek Unit which plaintiff desires to log has no economic value unless harvested. The Board's action in denying plaintiff the right to log the Walker Creek Unit has denied it of all economic use of that timber. Apart from the subject merchantable timber, the underlying commercial forestland has no separate economic value until the timber has been logged. After logging and replanting, with young forest tree species as required by law, the land would have a fair market value of $500 per acre.

"Since 1987, when the northern spotted owl was designated as a 'threatened species' pursuant to ORS 496.172, et seq., the State of Oregon has continued to sell its own merchantable timber in Clatsop County for the purpose of having it logged in order to provide revenue to various governmental entities and to manage its commercial timberland for future timber production. The State of Oregon has sold stands of merchantable timber that it owns within 20

miles of plaintiff's Walker Creek Unit even after the Board refused to permit plaintiff to log its merchantable timber.

"After the amended plan was denied approval by the Board in January 1993, on February 22, 1993, plaintiff submitted a written plan No. 93-251-11132 to log four acres of its Walker Creek Unit that the Oregon Department of Forestry had previously agreed could be harvested. On March 8, 1993, the Oregon Department of Forestry approved that plan, subject to the condition that logging operations not begin until October 1, 1993, and end by March 1, 1994, because of the close proximity of those four acres to the spotted owl nest sites in the adjacent core area.

"On March 19, 1993, plaintiff appealed to the Board the temporal condition placed on its right to log the four acres on the basis that the restriction constituted a temporary taking of the subject timber. After a hearing, the Board on April 19, 1993, issued its order refusing to remove the temporal condition which prevents plaintiff from commencing logging operations before October 1, 1993. The Board's action in refusing to remove the temporal condition was a final administrative action which prevents plaintiff from logging its timber in a timely manner.

"Boise Cascade is presently deprived of all economic use of its merchantable timber on the subject four acres."

The two aspects of plaintiff's factual recitation with which the state disagrees are, in the state's words, the allegations that "plaintiff is presently deprived of all economic use of its merchantable timber on land governed by the restriction in OAR 629-24-809," and that the "underlying commercial forestland has no separate economic value until the timber has been logged." The state argues that both allegations are conclusions of law, which should not be considered in determining whether the complaint states a claim. The state also argues that the second allegation is legally wrong, because the timber and the land are not separable property interests, and the land has value notwithstanding regulations on the logging of the timber.

■ The state is incorrect on both points. The state's argument concerning the separability of the timber and the land is adversely answered by *Hawkins v. City of La Grande*, 315 Or 57, 70-71, 843 P2d 500 (1992), and its efforts to

distinguish that case do not persuade us. Moreover, for purposes of our review of the motion to dismiss, the point is close to academic: Plaintiff alleges that, if it cannot log the land, the land has no economically viable or beneficial use. In other words, plaintiff alleges that, at least as of now, it has lost all economic and beneficial use of the land, as well as of the timber, by virtue of the restrictions on logging.

■     The state's second point apparently is premised on the fact that loss of all economically viable or substantial beneficial use of property is the *legal* test for whether a regulatory taking can be found under the Fifth Amendment and Article I, section 18, respectively. *See Lucas v. South Carolina Coastal Council*, ___ US ___, 112 S Ct 2886, 120 L Ed 2d 798 (1992); *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 581 P2d 50 (1978). However, whether such a loss has occurred is also a factual question, and it is an ultimate question of fact in a regulatory takings case.

Plaintiff's pleading of that fact, coupled with the state's choice to proceed by a motion to dismiss, makes the disposition of this appeal turn on what is alleged in the complaint rather than on what the factual and legal merits of the parties' cases may ultimately prove to be. Many of the state's arguments in this appeal present matters that are outside the complaint. As noted, our review of a motion to dismiss for failure to state a claim starts with the premise that all well-pleaded allegations in the complaint are true, and our review is confined to matters that appear in the complaint. ORCP 21A; *Emmert v. O'Brien*, 72 Or App 752, 754, 697 P2d 222 (1985).

For that reason, at *this* stage of the present case, we are in much the same position that the reviewing courts were in *Lucas v. South Carolina Coastal Council, supra*. As the Oregon Supreme Court observed in *Dodd v. Hood River County*, 317 Or 172, 183 n 13, 855 P2d 608 (1993), the state in *Lucas* "chose not to contest at any level the landowner's allegation that his land had been rendered absolutely worthless" by the regulation in question. Here, the state's motion to dismiss for failure to state a claim concedes plaintiff's corresponding allegation for purposes of the ruling on the motion and of our disposition of the present appeal. The difference between the cases is that, in *Lucas*, the state's

failure to deny the contention at *any point* amounted to a confession of ultimate judgment, while in this case the presumption of the allegation's truth extends only to the proceedings on the preliminary motion that is now before us. With the foregoing as prologue, we turn to the parties' specific arguments.

■■ In its first assignment, plaintiff contends that the court erred by ruling that it lacked subject matter jurisdiction. The apparent basis for the ruling, and the principal basis on which the state defends it in this appeal, was that the board's action was taken in the context of a contested case proceeding, and it is subject to exclusive review under applicable provisions of the Administrative Procedures Act (APA). ORS 183.310 *et seq*; *see* ORS 183.482.[3]

The remedy plaintiff seeks here is compensation for the taking that it contends the board's action has occasioned. If all of plaintiff's material allegations are found to be true, its right to that remedy does not depend on whether the board's orders are reversible on direct review. Stated another way, plaintiff does not seek review in this case of what the board *did* but seeks relief for the taking that it maintains the board action has *caused*. Accordingly, plaintiff contends that an inverse condemnation proceeding is not made unavailable on the ground that there is an exclusive APA remedy, because it is not seeking review of the correctness of the board's orders; rather, plaintiff is contending that, right or wrong, the orders impose a regulation that results in a taking. We agree with plaintiff on that aspect of its jurisdictional argument. This action is not part of the administrative process and is not subject to or restricted by the APA. However, the parties' other jurisdictional contentions require more extensive discussion.

■ Both parties rely on *Dunn v. City of Redmond*, 303 Or 201, 735 P2d 609 (1987). The Supreme Court held there that

---

[3] Plaintiff has sought APA review of the board's orders, and we have issued our decision on those petitions simultaneously with this decision. *Boise Cascade Corp. v. Board of Forestry (A78968)*, 131 Or App 552, 886 P2d 1041 (1994). Some of the jurisdictional arguments we address here appear in the parties' briefs in *that* case rather than in their presentations in this appeal. However, because the issue is jurisdictional, we are free to consider factors the parties do not raise here, as well as those they do.

takings claims may be asserted in circuit court inverse condemnation actions, as well as in appeals to the Land Use Board of Appeals (LUBA) from local land use decisions. Each party relies on language in *Dunn* that, read in its selected context, supports the party's position. The state takes the view that *Dunn* supports the proposition that an agency has "primary jurisdiction" to decide whether its regulation gives rise to a taking; only after the agency has made that determination does circuit court authority arise to decide actions that can culminate in monetary relief. According to the state, not until an agency has decided whether a taking would result from its regulatory action can it be appropriate for damages to be considered; up to that point, the agency has the right to change its regulatory decision and thereby avoid both the need for compensating a landowner and the circuit court proceeding that could result in that remedy. Hence, the state concludes that the circuit courts do not obtain jurisdiction before the agency has decided initially whether a regulatory taking has resulted from its regulatory action.

In *Springer v. City of Bend*, 111 Or App 136, 826 P2d 1, *rev den* 313 Or 354 (1992), and *Nelson v. City of Lake Oswego*, 126 Or App 416, 869 P2d 350 (1994), we addressed the effect of *Dunn* on circuit court jurisdiction and authority over inverse condemnation claims. We said in *Springer* that the Supreme Court had concluded in *Dunn*:

> "[A]lthough damages for inverse condemnation could only be recovered in a judicial action, 'regulatory takings' issues could arise as constitutional questions and be relevant in LUBA's disposition of appeals from local land use decisions. The court concluded that inverse condemnation issues could be asserted in both forums.
>
> "Circuit courts have always had jurisdiction—exclusive *or* concurrent—to try inverse condemnation claims; neither [the Supreme Court's nor this court's] opinion in *Dunn* did anything to change that, and both in fact reiterated it." 111 Or App at 138-39. (Emphasis in original; footnote omitted.)

However, we also noted in *Springer*:

> "The Supreme Court suggested that there might be circumstances in which a circuit court must delay a decision on an inverse condemnation claim until LUBA has decided a corresponding issue that is pending before it." 111 Or App at 139 n 1.

If the question here was whether *LUBA* or the circuit court had initial *authority* to decide the question, we might agree with the distinction that the state draws as it applies to that agency's initial authority and the circuit court's.[4] For a number of reasons, however, we cannot agree with the state's argument that, under *Dunn* or our cases, the circuit court lacked *jurisdiction* over this action. First, both *Dunn* and *Springer* make clear that the circuit courts *retain* their historical jurisdiction over inverse condemnation claims. *Dunn* does not purport to change that but, rather, holds that the statutes governing LUBA review *add* a form of concurrent LUBA jurisdiction; *Dunn* also holds that issues relating to the sequence of LUBA's and the courts' authority to act will arise in some contexts. However, neither of those holdings divests the circuit court of subject matter jurisdiction over inverse condemnation actions. They simply address the allocation or timing of authority between bodies that share jurisdiction.

The other reasons for our conclusion stem from the fact that the issue in this case does not involve LUBA's authority to decide takings questions; instead, the state asserts that agencies other than LUBA, whose regulations purportedly give rise to takings, have initial jurisdiction of the kind defined in *Dunn* to decide whether their own actions have occasioned takings. However, the court in *Dunn* did not purport to make a general or abstract allocation of jurisdiction or authority between the circuit courts and all agencies; rather, the *Dunn* decision was based very specifically on the statutes that confer jurisdiction on LUBA to review land use decisions and constitutional questions that arise in connection with them. *See* ORS 197.835(7)(a)(E). On the basis of

---

[4] The court in *Dunn* summarized its holding:

"In sum, if an owner seeks to have a land use decision set aside on constitutional grounds, the owner must take that appeal to LUBA. An owner who maintains that the government's acts entitle him to compensation may seek compensation in [the] circuit court. If the owner seeks invalidation of the land use decision or compensation in the alternative, or both, and the government defends the validity of its regulatory decision and denies that compensation is due, the court may have to withhold judgment until the legality of the land use decision is placed before and decided by LUBA and the government has had an opportunity to reconsider and modify its decision. The special provision for taking evidence beyond the record made before the local government, ORS 197.830(1), as was done here, shows that a full LUBA review of whatever may bear on the constitutionality of a land use decision was not beyond legislative contemplation." 309 Or at 209.

that statutory analysis, the court concluded that the legislature has conferred jurisdiction on LUBA to share part of the circuit courts' historical decisional authority over takings questions.

The state attempts by analogy to equate LUBA's role and the board's under the *Dunn* rationale. The analogy does not succeed because, *inter alia*, LUBA is an adjudicative agency, while the board is the regulatory agency whose action is subject to adjudication to determine if it has resulted in a taking. The proper analogy is not between the board and LUBA, but between the board and a governmental body, as described in *Dunn*, that chooses to "[defend] the validity of its regulatory decision" before LUBA or the courts. 303 Or at 209.

Whether it is performed by LUBA or the courts, the determination of whether a regulatory action results in a taking of private property is an adjudicative act. Leaving aside the fox in the henhouse problem with the state's contention that a regulatory agency should have sole original jurisdiction to decide in the same order that imposes a regulation whether the regulation results in a taking, the state's argument is mechanically flawed: The adjudication of whether there has been a regulatory taking will generally be dependent on a showing of facts that cannot even be known at the time that the regulatory decision is made, *e.g.*, the scope of the regulation's impact on a particular landowner's ability to make viable economic use of particular land. Although regulatory agencies obviously may consider whether their prospective actions might result in takings, nothing in *Dunn* or in logic supports the view that they have jurisdiction, to the exclusion of the circuit courts, to decide whether their own consummated regulatory actions have resulted in takings.[5]

We reject the state's jurisdictional argument, and we conclude that the trial court erred by ruling that it lacked jurisdiction. We turn to the ripeness issue. It is unclear

---

[5] We need not decide here whether the board has *any decisional* authority over such questions. The issue is whether the circuit court has jurisdiction. *See also Boise Cascade Corp. v. Board of Forestry (A78968), supra,* 131 Or App at 555 n 1.

We note that there was no "land use decision" or other event here that could have been appealed to LUBA. The board is the only agency that was or could have been involved in the relevant final decisions.

whether the state's contention that the APA provides plaintiff's exclusive remedy is meant to relate solely to jurisdiction, or is also meant to suggest that the action is not ripe, because plaintiff did not exhaust available appeals from the board's orders to reviewing bodies before bringing this action. If the latter point is intended, we rejected a materially similar contention in *Nelson v. City of Lake Oswego, supra,* and we reject the present variation of it as well. The state's other ripeness arguments depend on facts that cannot be determined from the complaint or the record before us. *See* n 2, *supra.* We hold that it was error to dismiss the action on ripeness grounds.

■ The remaining question is whether the trial court was correct in ruling that plaintiff's complaint fails to state a claim. The state makes a number of arguments that are directed against specific allegations and theories that plaintiff pleads. However, the state also makes one argument attacking the sufficiency of plaintiff's complaint as a whole. It contends that plaintiff did not and cannot plead that the alleged taking was an act by "a state agency authorized to exercise the power of eminent domain." According to the state, the board has no authority to condemn property. The state argues that that is an essential element of an inverse condemnation claim under *Tomasek v. Oregon Highway Com'n,* 196 Or 120, 147, 248 P2d 703 (1952), and later cases that follow it. However, the state reads *Tomasek* too literally; on the page of its opinion following the language on which the state relies, the court rejected as an "erroneous premise" the defendant's contention "that a distinction is to be drawn between the state itself and its agencies." 196 Or at 148.

■ More fundamentally, unlike the present case, *Tomasek* did not involve an alleged *regulatory* taking. Assuming that the state correctly reads *Tomasek* in its own context, the principle the state derives from it has no logical application in the regulatory takings context. It would be nonsensical to hold that there can be no regulatory taking claim if the regulatory agency whose action allegedly causes the taking happens not to have the power to condemn as well as the power to regulate. Even assuming that the Fifth Amendment would permit the state to make inverse condemnation proceedings unavailable for regulatory taking claims that are

unrelated to the potential exercise of the eminent domain power, *Dunn v. City of Redmond, supra*, and *Springer v. City of Bend, supra*, make it clear that such proceedings are available for that purpose in this state.

Although plaintiff pleads a variety of *theories*, it has attempted to state only two *claims*: that there has been a taking of the "core" area of its property and that there has been a temporary taking of the four-acre tract that was subject to the board's "temporal" restriction on logging. In both contexts, plaintiff alleges, in essence, that the government has regulated its property in such a way that productive uses are unavailable and all viable economic and beneficial use has been eliminated. Those allegations suffice to state regulatory taking claims under both constitutions as to the principal part of the property, *see Lucas v. South Carolina Coastal Council, supra*; *Fifth Avenue Corp. v. Washington Co., supra*, and a temporary taking of the four-acre part. *See First Lutheran Church v. Los Angeles County*, 482 US 304, 107 S Ct 2378, 96 L Ed 2d 250 (1987).

Because the motion to dismiss was directed against and allowed as to the entire complaint, it is unnecessary for us to decide whether any or all of plaintiff's alternative taking theories may prove to be factually or legally tenable. We nevertheless note that, even assuming the correctness of plaintiff's legal premises, the presence or absence of the requisite facts to support plaintiff's permanent physical occupation and its reasonable investment-backed expectations theories cannot be determined without further evidentiary development.

The parties' remaining arguments either require no further separate discussion or relate to matters that are beyond the reviewable record.

Reversed and remanded.