Argued and submitted January 10, 1996, decision of the Court of Appeals and judgment of the circuit court affirmed in part and reversed in part, and case remanded to the circuit court for further proceedings April 10, 1997

BOISE CASCADE CORPORATION,
A Delaware corporation,
*Respondent on Review,*

*v.*

STATE OF OREGON,
by and through
THE OREGON STATE BOARD OF FORESTRY,
*Petitioner on Review.*

(CC 93-2018; CA A79626; SC S42159)

935 P2d 411

Virginia L. Linder, Solicitor General, Salem, argued the cause for petitioner on review. With her on the brief were Theodore R. Kulongoski, Attorney General, and John T. Bagg, Assistant Attorney General.

Phillip D. Chadsey, of Stoel Rives Boley Jones & Grey, Portland, argued the cause for respondent on review. With him on the briefs was Charles F. Adams.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, and Durham, Justices.**

GILLETTE, J.

** Unis, J., retired June 30, 1996, and did not participate in this decision; Graber, J., did not participate in the consideration or decision of this case.

**GILLETTE, J.**

This is an inverse condemnation case in which plaintiff Boise Cascade asserts that the defendant State of Oregon, acting through its Board of Forestry, has "taken" certain property of Boise Cascade by promulgating a rule that, Boise Cascade alleges, denies Boise Cascade all beneficial use of the property.[1] The state seeks review of a decision of the Court of Appeals, which reversed a circuit court order that dismissed plaintiff's inverse condemnation action under ORCP 21[2] on several grounds. *Boise Cascade Corp. v. Board of Forestry*, 131 Or App 538, 886 P2d 1033 (1994) (*Boise I*).[3] There are two issues before us: (1) whether, in an inverse condemnation proceeding of this kind, a court should (or must) stay its own proceeding until the agency first has an opportunity to determine whether the application of its rule effected a "taking" and, if not, (2) whether plaintiff has stated a claim in this case. We conclude that plaintiff's complaint properly was before the circuit court, because the circuit

---

[1] "Inverse condemnation" refers to a claim "against a governmental agency to recover the value of property taken by the agency although no formal exercise of the power of eminent domain has been completed by the taking agency." *Lincoln Loan v. State Hwy. Comm.*, 274 Or 49, 51 n 1, 545 P2d 105 (1976) (citing *Thornburg v. Port of Portland*, 233 Or 178, 180, 376 P2d 100 (1963)).

" 'Eminent domain' is the power inherent in a sovereign state of taking or of authorizing the taking of any property within its jurisdiction for a public use or benefit." *GTE Northwest, Inc. v. Public Utility Commission*, 321 Or 458, 466, 900 P2d 495 (1995) (citing *Dept. of Trans. v. Lundberg*, 312 Or 568, 571 n 1, 825 P2d 641 (1992)).

[2] ORCP 21 A(8) provides:

"Every defense, in law or fact, to a claim for relief in any pleading, whether a complaint, counterclaim, cross-claim or third party claim, shall be asserted in the responsive pleading thereto, except that the following defenses may at the option of the pleader be made by motion to dismiss: * * * (8) failure to state ultimate facts sufficient to constitute a claim[.]"

[3] *Boise I* was consolidated for purposes of oral argument in this court with our review of *Boise Cascade Corp v. Board of Forestry*, 131 Or App 552, 886 P2d 1041 (1994) (*Boise II*). *Boise II* involves two petitions for judicial review of two final orders of the Board of Forestry. The first final order, dated January 15, 1993, denied plaintiff's plan to log the same 64-acre property owned by plaintiff that is the subject of the present case. The second final order, dated April 19, 1993, approved plaintiff's plan to log four acres within the larger parcel, subject to a temporal restriction that no logging occur during spotted owl nesting season. Plaintiff sought judicial review of both final orders in the Court of Appeals. The Court of Appeals consolidated the two administrative petitions (*Boise II*), but did not consolidate the circuit court appeal (*Boise I*) with *Boise II*.

court and the Board share concurrent jurisdiction in this case. We also conclude that certain of the allegations in plaintiff's complaint are sufficient to survive a motion to dismiss.

## FACTS

In February 1992, plaintiff filed a proposal with the Oregon Department of Forestry (the Department) to log a 64-acre parcel of plaintiff's land (the Walker Creek Unit).[4] The land contains northern spotted owl nests and is subject to the northern spotted owl protection provisions of OAR 629-24-809, which the Board of Forestry (the Board) adopted in 1990.[5] The Department denied the proposal on the ground that the logging plan did not provide sufficient protection for spotted owl habitat, as required by OAR 629-24-809.

In May 1992, plaintiff submitted an amended logging plan. The Department again denied the proposal, pursuant to OAR 629-24-809, but advised plaintiff that eight specified acres of the Walker Creek Unit *could* be logged, if the logging did not take place either between March 1 and

---

[4] The Oregon Blue Book adequately describes the relationship between the Board of Forestry, State Department of Forestry, and the State Forester as follows:

"The seven-member board [of forestry], appointed by the governor, makes policy and provides vision to the overall management and protection of the state's 11 million acres of state-owned and private forest land. It operates under ORS chapter 526 in setting forest policy for the state. The board authorizes a forestry program for Oregon designed to assure an adequate future wood supply to benefit society, the economy and the environment.

"The Department of Forestry, authorized by ORS 526.008 and established in 1911, is under the direction of the state forester, who is appointed by the Board of Forestry. The statutes direct the state forester to act on all matters pertaining to forestry, the protection of forest lands and the conservation of forest resources."

Claire Levine, ed, *1995-96 Oregon Blue Book*, 67 (1995).

[5] OAR 629-24-809 provides, in part:

"(1) Whenever the State Forester determines that an operation will conflict with protection of a nesting site of the northern spotted owl * * *, the operator must obtain the State Forester's approval of a written plan before commencing the operation. The written plan, at a minimum, must address how the operation will be conducted to provide for the following:

"(a) A 70 acre area of suitable spotted owl habitat encompassing the nest site, to be maintained as suitable spotted owl habitat;

"(b) Prevention of disturbances resulting from operation activities which cause owls to flush from the nesting site. Such disturbances must be prevented during the critical period of use for nesting. The critical period of use is the time period between March 1 and September 30, each year."

September 30, 1992 (which was the critical period of use), or until young spotted owls fledged. Plaintiff appealed that decision to the Board arguing, *inter alia*, that such an application of OAR 629-24-809 to its Walker Creek Unit property effected a "taking" of that property under the state and federal constitutions.

On January 15, 1993, the Board rejected plaintiff's challenge and entered a final order denying plaintiff's logging plan for the 64 acres. With respect to plaintiff's "takings" argument, the Board stated:

"Boise Cascade appears to have been undecided as to the appropriate time to advance this argument. Although it asserts * * * that such an argument is not premature, it did not at hearing attempt to present evidence that any 'taking' had in fact occurred. * * * Certainly[,] there is an inadequate factual basis upon which to advance any claim of a constitutional taking."

On February 1, 1993, plaintiff filed this inverse condemnation action in Clatsop County Circuit Court, alleging that the Board's application of its administrative rule constituted a "taking" under Article I, section 18, of the Oregon Constitution, and under the Fifth Amendment to the United States Constitution.[6] (*Boise I*).

On February 22, 1993, after it had filed the present action, plaintiff submitted a plan to log four of the eight acres that the Department previously had agreed could be harvested. On March 8, 1993, the Department approved plaintiff's plan, subject to a condition that the logging not begin until October 1, 1993, and end by March 1, 1994, when no nesting would take place. Plaintiff appealed that temporal

---

[6] Article I, section 18, of the Oregon Constitution, provides:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered[.]"

The Fifth Amendment to the United States Constitution provides:

"No person shall * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The Takings Clause of the Fifth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Nollan v. California Coastal Comm'n*, 483 US 825, 827, 107 S Ct 3141, 97 L Ed 2d 677 (1987).

restriction to the Board and argued, *inter alia*, that the temporal restriction also constituted a temporary "taking" under the state and federal constitutions.

On March 17, 1993, while its second "takings" claim concerning the four-acre parcel still was pending before the Board, plaintiff petitioned the Court of Appeals for judicial review of the Board's January 15, 1993, order. (*Boise II*).

On April 19, 1993, the Board rejected plaintiff's challenge to the temporal restriction concerning the four acres and entered a second final order. In that order, the Board *did not address* the "takings" issue. Rather, the Board stated that "[t]he issue of whether there is a taking would more properly be [addressed] in a court of competent jurisdiction, once administrative remedies are exhausted."

On April 22, 1993, plaintiff filed a supplemental complaint in the present circuit court action, alleging that the separate temporal restriction on logging the four acres constituted a separate "taking." (*Boise I*).

On April 26, 1993, plaintiff filed a second petition for judicial review, seeking review of the Board's April 19, 1993, order that refused to remove the temporal condition on logging of the four acres. As noted, the Court of Appeals consolidated that proceeding with the earlier administrative review proceeding. (*Boise II*).

In May 1993, the circuit court granted the state's motion to dismiss the entire inverse condemnation claim on the grounds that the court lacked subject matter jurisdiction over the dispute, that the action was not ripe, and that the complaint failed to state a claim. (*Boise I*). Plaintiff appealed the circuit court's ruling to the Court of Appeals, which reversed the dismissal of plaintiff's inverse condemnation claim on all three grounds. The state petitioned for review.[7]

---

[7] We reject the state's ripeness arguments for the reasons stated in the Court of Appeals' opinion. *Boise I*, 131 Or App at 540 n 2.

## DISCUSSION

### 1. *Jurisdiction*

 The first issue presented is whether, as the state argues, in a regulatory "takings" claim, the agency that promulgated the rule that is alleged to effect a "taking" has primary jurisdiction to determine whether the application of that rule does, in fact, constitute a "taking."[8] The Court of Appeals held that the Board and the circuit court have *concurrent* jurisdiction over plaintiff's "takings" claims, but declined to decide whether the Board has any "decisional authority" initially to decide the "takings" issue. *Boise I*, 131 Or App at 546-49. The state advances two arguments on review: (1) The Board has "exclusive" jurisdiction, to the exclusion of the circuit court, to decide the "takings" issue; or, (2) alternatively, a regulatory "takings" claim must be resolved, in the first instance, by the agency whose rule is alleged to have effected a "taking," because the agency has "primary jurisdiction" over such claims.

 There are two types of "primary" jurisdiction. First, *statutory* primary jurisdiction exists when a statute "specifically requires courts to apply the primary jurisdiction doctrine to a class of disputes." Kenneth Culp Davis and Richard J. Pierce, Jr., II *Administrative Law Treatise* § 14.1, 276 (3d ed 1994) (hereafter Davis and Pierce).[9] Second, by contrast, "[i]n the bulk of cases * * *, primary jurisdiction is a judge-made doctrine. Its scope and effect are determined by judicial

---

[8] The doctrine of "primary" jurisdiction is defined as a doctrine under which, "where the law vests in an administrative agency the power to decide a controversy or treat an issue, the courts will refrain from entertaining the case until the agency has fulfilled its statutory obligation." *Black's Law Dictionary* 1190-91 (6th ed 1990). An even clearer and more comprehensive definition appears in a standard layman's dictionary: "[T]he right or responsibility of an administrative or regulatory agency to pass initially on controversies involving matters of fact or discretion within its sphere before relief is sought in the courts[.]" *Webster's Third New Int'l Dictionary* 1800 (unabridged ed 1993). "Exclusive" jurisdiction is defined as jurisdiction "to the exclusion of all other [tribunals]." *Black's* at 564. "Concurrent" jurisdiction means, in this case, that a court and administrative agency share "[a]uthority * * * to deal with the same subject matter." *Id.* at 291.

[9] For example, Professor Davis notes that "Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., provid[es] for nonjudicial and nonadversary resolution of claims and provid[es] that a complainant in a state or locality with a fair employment commission must first go to that commission with his claim." Davis and Pierce, § 14.1 at 276.

reasoning." *Ibid.* There is no statute that addresses the issue before us; the state in this case is asserting the latter type of primary jurisdiction.

■■ Judicial invocation of the doctrine of primary jurisdiction generally is appropriate when a court decides that an administrative agency, rather than a court of law, initially should determine the outcome of a dispute or one or more issues within that dispute that fall within that agency's statutory authority. The purpose behind the doctrine is the "recognition of the need for orderly and sensible coordination of the work of agencies and of courts." Kenneth Culp Davis, *Administrative Law Text* § 19.01, 374 (3d ed 1972). The reason for the doctrine is "not a belief that an agency's expertise makes it superior to a court; [but] that a court confronted with problems within an agency's areas of specialization should have the advantage of whatever contributions the agency can make to the solutions." *Id.*, § 19.06 at 381. That is, the doctrine is one ordinarily invoked by a court in the traditional judicial system with the belief that a previous agency disposition of one or more issues before the court will assist the court in resolving the case before it.

■ Courts vary in their approaches to invoking the doctrine of primary jurisdiction. According to one treatise on administrative law, with which we agree:

> "There is no fixed formula for determining whether an agency has primary jurisdiction over a dispute or an issue raised in a dispute. In making such determinations, courts consider several factors, including (1) the extent to which the agency's specialized expertise makes it a preferable forum for resolving the issue, (2) the need for uniform resolution of the issue, and (3) the potential that judicial resolution of the issue will have an adverse impact on the agency's performance of its regulatory responsibilities."

Davis and Pierce, § 14.1 at 272. The authors also observe, however, that, "[i]ncreasingly, * * * courts balance the considerations that favor allocation of initial decisionmaking responsibility to an agency against the likelihood that application of primary jurisdiction will unduly delay resolution of the dispute before the court." *Ibid.*

 Upon invoking the doctrine of primary jurisdiction, the disposition of the case depends on the nature of the parties' dispute and the scope of the agency's authority. If an agency has primary jurisdiction over the entire *dispute*, the court action is dismissed. However, if an agency has primary jurisdiction over an *issue* in dispute,

> "the court will defer any decision in the action before it until the agency has addressed the issue that is within its primary jurisdiction. The court retains jurisdiction over the dispute itself and all other issues raised by the dispute, but it cannot resolve that dispute until the agency has resolved the issue that is in its primary jurisdiction."

Davis and Pierce, § 14.1 at 271.

We now turn to the present case. The state argued in the Court of Appeals that the Board has primary jurisdiction over the "takings" claim under *Dunn v. City of Redmond*, 303 Or 201, 735 P2d 609 (1987).[10] The Court of Appeals rejected that argument for two reasons. First, the court concluded that *Dunn* did not hold that circuit courts lack jurisdiction over inverse condemnation claims. Rather, that case concerned the sequence of the Land Use Board of Appeals (LUBA) and the circuit court's authority to act in some contexts, where both land use and "takings" issues were asserted and intertwined. *Boise I*, 131 Or App at 548. Second, the Court of Appeals observed that *Dunn* dealt with LUBA's authority to decide "takings" questions and "did not purport to make a general or abstract allocation of jurisdiction or authority between the circuit courts and all agencies." *Ibid.*

The Court of Appeals also observed that LUBA is an adjudicative agency, while the Board is a regulatory agency, and that "the determination of whether a regulatory action results in a taking of private property is an adjudicative act." *Id.* at 549. The court stated:

> "Leaving aside the fox in the henhouse problem with the state's contention that a regulatory agency should have sole original jurisdiction to decide in the same order that imposes a regulation whether the regulation results in a taking, the state's argument is mechanically flawed: The

---

[10] The facts and procedural history of *Dunn* are discussed below, 325 Or at 195.

adjudication of whether there has been a regulatory taking will generally be dependent on a showing of facts that cannot even be known at the time that the regulatory decision is made, *e.g.*, the scope of the regulation's impact on a particular landowner's ability to make viable economic use of particular land. Although regulatory agencies obviously may consider whether their prospective actions might result in takings, nothing in *Dunn* or in logic supports the view that they have jurisdiction, to the exclusion of the circuit courts, to decide whether their own consummated regulatory actions have resulted in takings."

*Ibid.* (footnote omitted).

On review, the state challenges what it describes as the Court of Appeals' "overly narrow" application of *Dunn.* The state concedes that *Dunn* arose in a different context from this case, but argues that the rationale underlying *Dunn* supports the conclusion that the agency has *primary jurisdiction* to resolve a regulatory "takings" claim in this case.[11] In the state's view, *Dunn* "stands for the proposition that the forum jurisdiction issue requires an examination, first and foremost, of the statutory scheme that the legislature has put into place" and for the proposition that "the legislature may place jurisdiction over takings claims in an administrative venue, and that legislative choice will be respected by the courts."

The state observes that the Board, like other administrative agencies, has authority to consider a complaint that includes constitutional claims. From that fact, the state reasons that the Board has authority to resolve a "takings" claim. According to the state, "[t]he fact that the board has the authority to adjudicate constitutional challenges to its own rule, and that under the APA [Oregon Administrative Procedures Act (ORS chapter 183)] its decisions are subject to full judicial review, should have led the Court of Appeals to conclude that the board has primary, if not exclusive, jurisdiction over the takings challenge." The state also argues, *inter alia*, that an inverse condemnation action in circuit

---

[11] In the alternative, the state argues that the Court of Appeals should have concluded "that the board has primary, *if not exclusive*, jurisdiction over the takings challenge." (Emphasis added.)

court is duplicative and unnecessary, because administrative proceedings and judicial review of those proceedings adequately protect the constitutional interests at stake.

At the outset, we note that the state's reliance on *Dunn* is misplaced. In *Dunn*, a petitioner sought judicial review of LUBA's determination that two city ordinances did not constitute a "taking" of petitioner's land. The landowner argued that the ordinances allowed the city to "take" property, in violation of the state and federal constitutions. The Court of Appeals did not reach the merits of that claim, because it decided *sua sponte* that the challenged actions were beyond LUBA's jurisdiction and ordered LUBA to dismiss the proceeding. *Dunn v. City of Redmond*, 82 Or App 36, 727 P2d 145 (1986).

On review, this court noted that "Oregon land use law assigns * * * LUBA 'exclusive jurisdiction' to review a 'land use decision,' including review of its constitutionality. ORS 197.825, 197.835(8)(a)(E)." *Dunn*, 303 Or at 203. The court also noted that, under the applicable statutes, LUBA could "reverse or remand" an unconstitutional land use decision. On the other hand, LUBA could not "award compensation when the constitutional claim is that the challenged decision takes private property for public use without just compensation." *Id.* at 204. The court stated:

> "In sum, if an owner seeks to have a land use decision set aside on constitutional grounds, the owner must take that appeal to LUBA. An owner who maintains that the government's acts entitle him to compensation may seek compensation in circuit court. If the owner seeks invalidation of the land use decision or compensation in the alternative, or both, and the government defends the validity of its regulatory decision and denies that compensation is due, the [circuit] court may have to withhold judgment until the legality of the land use decision is placed before and decided by LUBA and the government has had an opportunity to reconsider and modify its decision."

*Id.* at 209. *Dunn* rejected the Court of Appeals' conclusion that "LUBA loses jurisdiction whenever 'a taking claim is asserted,' even if the petition asserts that claim in an effort to invalidate a land use decision rather than to obtain compensation." *Id.* at 208.

▮▮▮▮ In contrast to *Dunn*, this case does not involve a legislative grant of "exclusive jurisdiction" to an agency such as LUBA to consider plaintiff's claim. Rather, this case involves a circuit court challenge to final orders that the Board had the authority to enter. The alleged *effect* of the final orders was to preclude plaintiff from using its land. In our view, *Dunn* makes it clear that the fact that plaintiff's inverse condemnation claim *stems from* an agency order does not preclude the circuit court from exercising jurisdiction. The issue presented—whether a "taking" occurred—is a constitutional question, and the context within which it is raised, an inverse condemnation action, traditionally falls within an area adjudicated by courts. Therefore, the traditional rationales for primary jurisdiction, such as agency expertise, collateral estoppel, and efficiency either are not applicable or are present only to a diminished degree.

▮▮▮▮ Moreover, in this case, "the special competence of an administrative body" is not required to determine whether the application of OAR 629-24-809 effected a "taking" of plaintiff's land. *Cf.* Kenneth Culp Davis, *Administrative Law* 121 (6th ed 1977) ("a court should not act upon subject matter that is peculiarly within the agency's specialized field without taking into account what the agency has to offer"). Likewise, other justifications for invoking the doctrine of primary jurisdiction, such as a need for uniform resolution of the legal issue involved or a consideration whether judicial resolution of the issue may adversely impact the agency's performance of its regulatory responsibilities, are not present in this context. Accordingly, it is not appropriate in this case to prevent the circuit court from exercising its jurisdiction over plaintiff's "takings" claim by invoking the doctrine of primary jurisdiction. That being so, we hold that plaintiff's complaint properly was before the circuit court, because the circuit court and the Board share concurrent jurisdiction in this case. It follows that the trial court erred in dismissing the action for lack of subject matter jurisdiction.

2. *"Takings" by inverse condemnation under the Oregon Constitution*

▮▮▮▮ Because this case comes to us on appeal of a judgment of dismissal, we next must determine whether

plaintiff's complaint states a claim for relief.[12] For purposes of reviewing a motion to dismiss, we assume the truth of all well-pleaded facts alleged in the complaint and give plaintiff the benefit of all favorable inferences that may be drawn from those facts. *Stringer v. Car Data Systems, Inc.*, 314 Or 576, 584, 841 P2d 1183 (1992); *Oksenholt v. Lederle Laboratories*, 294 Or 213, 215, 656 P2d 293 (1982). In order to determine whether the complaint states a claim for relief, we first must discern what is required to establish a "takings" claim under Oregon law.[13]

Our decisional law demonstrates that there are at least two different ways in which governmental action *may* result in a "taking" by inverse condemnation under Article I, section 18, of the Oregon Constitution. The first arises when a present governmental action creates an expectation that the private land in question *eventually* will be taken for a public use. *See Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 613, 581 P2d 50 (1978) (illustrating concept). In such circumstances, a property owner must prove that the owner is precluded from "all economically feasible private uses [of the property] pending eventual taking for public use" or that "the designation [of the property for eventual public use] results in such governmental intrusion as to inflict virtually irreversible damage." *Id.* at 613-14.

The second category of "takings" by inverse condemnation occurs when the government acts to "intervene[ ] to straighten out situations in which the citizenry is in conflict over land use or where one person's use of his land is injurious to others." *Fifth Avenue Corp.*, 282 Or at 613 (quoting *Fred F. French Inv. Co., Inc. v. City of New York*, 39 NY2d 587, 385 NYS2d 5, 350 NE2d 381, 384-86 (citing Joseph L. Sax, *Takings and the Police Power*, 74 Yale LJ 36, 62-63 (1964)), *cert den* 429 US 990 (1976)). To establish a "taking" in the latter context, the test is essentially the same as under

---

[12] We use the term "complaint" to refer to the supplemental complaint on which the parties ultimately proceeded.

[13] This court considers state constitutional claims before considering federal constitutional claims. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983); *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981).

the former: The property owner must show that the application of the government's particular choice deprives the owner of *all economically viable use of the property. Fifth Avenue Corp.*, 282 Or at 609, 613. If the owner has "some substantial beneficial use" of the property remaining, then the owner fails to meet the test. *Dodd v. Hood River County*, 317 Or 172, 184-86, 855 P2d 608 (1993).

 In this case, plaintiff has alleged in both its claims for relief that the Board's application of OAR 629-24-809 to its proposed logging plans denied plaintiff all economic use of its land.[14] With respect to the first claim for relief, the plaintiff has alleged "depriv[ation] * * * of the only economically viable use of approximately 56 acres of merchantable timber." Assuming the truth of all well-pleaded facts alleged in the complaint and giving plaintiff the benefit of all favorable inferences that may be drawn from those facts, that allegation is sufficient to meet the "deprivation of all economically viable use of the property" standard. The Court of Appeals was correct in so holding.

 With respect to the second claim for relief, plaintiff has alleged two things: (1) The *"temporal* restriction prohibiting plaintiff from logging four acres of the unit until after

---

[14] Plaintiff's complaint outlines the lengthy procedural facts set forth above, which we will not repeat. The complaint also alleges, in part:

"Plaintiff asserts two claims for inverse condemnation based on the Oregon and U.S. Constitutions. The first claim seeks just compensation for this regulatory taking, *which deprives plaintiff of the only economically viable use of approximately 56 acres of the merchantable timber.* The second claim involves a *temporal restriction prohibiting plaintiff from logging four acres of the unit until after October 1, 1993, which constitutes a temporary taking of plaintiff's timber for a public use."*

FIRST CLAIM FOR RELIEF

*"The timber, including the two nest trees, on the Walker Creek Unit which plaintiff desires to log has no economic value unless harvested. The Board's action in denying plaintiff the right to log the Walker Creek Unit has denied it of all economic use of that timber. Apart from the subject merchantable timber, the underlying commercial forestland has no separate economic value until the timber has been logged."*

SECOND CLAIM FOR RELIEF

*"Plaintiff is presently deprived of all economic use of its merchantable timber on the subject four acres."*

(Emphasis added.)

October 1, 1993, * * * constitutes a *temporary* taking of plaintiff's timber for a public use," and (2) "[p]laintiff is *presently* deprived of all economic use of its merchantable timber on the subject four acres." (Emphasis added.) In other words, plaintiff alleges a *temporary* deprivation of all economically viable use of the four acres *during the six-month period* when the temporal restriction was in effect.

■ Both this court and the United States Supreme Court have recognized that, under certain circumstances, a "temporary" taking of all economic use of a piece of property may constitute a "taking" under the pertinent provisions of the state and federal constitutions. *See Suess Builders v. City of Beaverton*, 294 Or 254, 263, 656 P2d 306 (1982) (decided at least in part under Article I, section 18, of the Oregon Constitution; holding that complaint, liberally construed, could be deemed to allege that one or more local governments had "temporarily taken all economic use of the plaintiffs' property"); *First Lutheran Church v. Los Angeles County*, 482 US 304, 318, 107 S Ct 2378, 96 L Ed 2d 250 (1987) (holding to similar effect under Fifth and Fourteenth Amendments to the United States Constitution). But each of those cases was one in which a government regulation or ordinance that was on its face permanent in character allegedly prevented the owners from making *any* economic use of the property in question. By contrast, the allegations here affirmatively establish that, under the regulations, plaintiff *can* utilize the four acres in question for timber production during part of each calendar year. That is, the regulations appear to be permanent, but their interference with plaintiff's use of its property is not temporally comprehensive.

■ We think that, in order to distinguish between a "taking," on the one hand, and simple administrative inconvenience or delay, on the other, it is necessary to require that a complaining party allege some degree of permanence in its loss. We hold that, in order to assert a claim for a "temporary taking" under the Oregon Constitution, the complaining party must allege that it has been denied all economic use of its property under a law, ordinance, regulation, or other government action that either is permanent on its face or so long lived as to make any present economic plans for the property impractical. *See Suess Builders*, 294 Or at 262-63 (to that

effect). Under such a standard, plaintiff's complaint falls short. It alleges only that, during certain months of each year, it will not be permitted to harvest trees on the parcel. By necessary implication, there is nothing in the regulations that would prohibit harvesting during the balance of the year. To be a "taking," governmental action must be made of sterner stuff.

We understand the federal rule, under *First Lutheran*, to be to the same effect. 482 US at 318. The Court of Appeals erred in holding that plaintiff had alleged a sufficient claim in its second claim for relief.

The state attempts to avoid the entire "takings" question by relying on *GTE Northwest, Inc. v. Public Utility Commission*, 321 Or 458, 900 P2d 495 (1995). The state argues that *GTE* stands for the proposition that express eminent domain authority is the predicate to a compensable "taking." In *GTE*, plaintiff GTE (a telephone local exchange carrier (LEC)) sought review of certain collocation rules adopted by the Public Utility Commission (PUC).[15] Under the challenged rule, an LEC was required to allow an enhanced services provider (ESP) to occupy a portion of the LEC's property, for the purpose of placing the ESP's equipment there.

GTE argued that the PUC lacked the statutory authority to promulgate the collocation rules, because the rules allegedly constituted a "taking," in violation of the state and federal constitutions. GTE further argued that, because the PUC lacked the *express* eminent domain authority that is required before an agency may effect a "taking," the collocation rules are beyond the PUC's statutory authority, no matter how much compensation might be paid for actions taken under them. In other words, GTE argued that the PUC lacked authority to engage in acts, including rulemaking, that effect a "taking," because the PUC lacked *express* eminent domain authority to take property for a public purpose.

---

[15] " 'Collocation' means a service, offered by a[n] LEC, which provides for placement and installation of a customer's equipment, software, and databases on LEC premises. Premises include central offices, remote network facilities, or any other similar location owned by the LEC. The equipment, software, and databases are owned by the customer." *GTE*, 321 Or at 462.

This court in *GTE* outlined relevant decisional law and stated:

> "The cases cited above establish a bright-line rule: that an agency may not act in eminent domain without an express grant of power from the legislature. It is up to the legislature, not the PUC or any other administrative agency, to determine how those powers should be exercised. The legislature's reasons for granting or refusing to grant [to] an administrative agency the power to act in eminent domain may include a desire to refrain from depleting the public fisc. However, the legislature's decision may also be rooted in a number of other policy considerations.
>
> "* * * * *
>
> "In summary, the power of eminent domain may be exercised by an agency only if the agency has express statutory authority. The PUC does not have express statutory authority to promulgate rules that would effect a taking of an LEC's facilities."

321 Or at 467-68. The *GTE* court then concluded that the collocation rules effected a "taking" under the federal constitution, and struck them down. *Id.* at 477.

The state relies on that portion of *GTE* that defines the "bright-line" rule concerning express eminent domain authority. That passage from *GTE* is significant, the state argues, because express eminent domain authority "is a key element of an inverse condemnation claim and of the right to seek compensation for a regulatory taking."

The state misreads *GTE*. *GTE* involved a straightforward *eminent domain* action in which the issue was whether the state could "take" certain property and, if so, what compensation was owed to the property owner. Unlike *GTE*, this case involves an *inverse condemnation* action in which plaintiff alleges that the state "took" plaintiff's property when it issued two orders that prevented plaintiff from logging on two separate occasions. The "bright-line" rule set forth in *GTE* applies in the eminent domain context. In contrast, in an inverse condemnation action wherein a plaintiff alleges that a "taking" *has occurred* and the plaintiff seeks damages, *GTE* does *not* require a landowner to prove that an agency has express eminent domain authority as an element to an

inverse condemnation action. Rather, the issue in this case is whether the application of OAR 629-24-809 to plaintiff's timber harvest plans *resulted in* a "taking." Plaintiff has alleged that application of the rule in this case *did* result in a taking. *GTE* does not stand for any proposition that would defeat circuit court jurisdiction in such circumstances.

In summary, we conclude that the Board shares concurrent jurisdiction with the circuit court in this case. The Board does not have primary jurisdiction. Consequently, plaintiff's complaint was properly before the circuit court, assuming that it otherwise properly pleaded a claim for relief for inverse condemnation. We hold that it did adequately plead such a claim in its first claim for relief. It did not do so in its second claim for relief.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to that court for proceedings consistent with this opinion.