Argued and submitted March 12, reversed and remanded with instructions
September 24, 2003

COAST RANGE CONIFERS, LLC,
an Oregon Limited Liability Company,
*Appellant,*

*v.*

STATE OF OREGON,
by and through the
OREGON STATE BOARD OF FORESTRY,
*Respondent.*

011423; A117769

76 P3d 1148

Phillip D. Chadsey argued the cause for appellant. With him on the opening brief were James N. Westwood, Scott E. Crawford, and Stoel Rives LLP. With him on the reply brief was Charles F. Adams.

David F. Coursen, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Bart A. Brush filed the brief *amicus curiae* for Audubon Society of Portland, Institute for Fisheries Resources, Oregon Trout, Inc., and Pacific Coast Federation of Fisherman's Associations.

Before Landau, Presiding Judge, and Armstrong and Wollheim, Judges.

LANDAU, P. J.

532-b

## LANDAU, P. J.

In this inverse condemnation action, plaintiff Coast Range Conifers, LLC (CRC), contends that the state has taken its property without compensation by refusing to permit CRC to log timberland identified as a nesting site for bald eagles. CRC's complaint alleges regulatory takings claims based on both the state and the federal constitutions. The parties filed cross-motions for summary judgment. The trial court denied CRC's motion, granted the state's motion, and entered judgment dismissing CRC's claims. On appeal, CRC argues that the trial court should have granted its motion and denied the state's. We conclude that the trial court erred in granting the state's motion for summary judgment on the state takings claim and reverse and remand without addressing the disposition of the federal claim.

## I.  FACTUAL BACKGROUND

The relevant facts are not in dispute. CRC acquired a 40-acre parcel of forested land known as the "Beaver Tract." In the spring of 1998, an Oregon Department of Fish and Wildlife (ODFW) employee reported seeing two adult bald eagles at a nest site in the Beaver Tract. The following month, a United States Fish and Wildlife Service (USFWS) employee observed an unoccupied bald eagle nest on the Beaver Tract.

Bald eagles are listed as "threatened" under the Endangered Species Act. 16 USC § 1533 (2000); 50 CFR § 17.11 (2002). Among other things, that means that, before engaging in any logging that will damage the eagle nesting site, CRC was required to obtain a permit from ODFW. *See* OAR 629-605-0170; OAR 629-665-0020(2); OAR 629-665-0220.

On July 31, 1998, CRC submitted a written plan to log portions of the Beaver Tract within 330 feet of the bald eagle nest. The State Forester rejected the plan on the ground that it provided inadequate protection for the nesting site. The State Forester recommended a modified plan that provided a larger buffer for the nesting site.

On August 26, 1998, CRC submitted a revised written plan for the Beaver Tract. CRC proposed to harvest no closer than 400 feet from the bald eagle nest and to preserve 50 percent of the live trees between 400 and 500 feet from the nest. The State Forester approved that plan. CRC then harvested the timber on the approximately 31 acres located outside the protected area.

Following the annual bald eagle nesting season, CRC observed that the bald eagle nest on the Beaver Tract apparently was no longer occupied. On October 14, 1998, it then submitted a third written plan proposing to harvest the timber on the remaining nine acres of the 40-acre parcel. The State Forester denied the written plan.

CRC requested, and obtained, a hearing. The Board of Forestry (board) ultimately issued a final order upholding the denial. CRC then initiated this action for inverse condemnation. CRC's complaint alleges two claims, one for an uncompensated taking of property in violation of Article I, section 18, of the Oregon Constitution and the other for an uncompensated taking in violation of the Fifth Amendment to the United States Constitution. CRC broke down the second claim into four separate counts, one for each of four different takings theories under the federal constitution.

CRC moved for summary judgment as to liability on the state claim and on two counts of its federal claim. CRC supported its motion with an affidavit stating that it had been denied all economically productive use of the nine-acre tract that the state would not permit it to log. The state moved for summary judgment on all claims. The state argued that (1) by applying for, and receiving, approval of the August 26, 1998, written plan that proposed logging only 31 acres, CRC either had waived or was estopped from complaining that it could not log the balance of the Beaver Tract; (2) because CRC should have sought review of the board's decision by petitioning for review in the Court of Appeals, the trial court lacked jurisdiction; (3) CRC's inverse condemnation claim was barred by issue and claim preclusion based on the board's final order; (4) the two counts of CRC's federal constitutional claim failed on the merits, as a matter of law.

The trial court agreed with the state on all points and entered a judgment dismissing CRC's claims.

## II.   DISPOSITION OF THE MERITS

On appeal, CRC advances 14 assignments of error. In the first four assignments, CRC argues that the trial court erred in concluding that the state was entitled to judgment on certain procedural grounds, namely, lack of jurisdiction and preclusion. In the balance of the assignments, CRC argues that the trial court erred in various other ways, principally, in agreeing with the state on the merits. In response, the state concedes the first four assignments of error and agrees that the trial court erred in concluding that CRC's claims are barred by lack of jurisdiction and preclusion. The state insists that the trial court's entry of judgment nevertheless may be upheld on other grounds, specifically, that CRC waived or is estopped from asserting its claims or that each of CRC's claims fails on the merits as a matter of law.

At the outset, we note that the parties should have framed their arguments in rather fewer than 14 different assignments of error. CRC devotes a separate assignment of error to each of the trial court's alternate *rationales* for entering summary judgment on CRC's two claims. Assignments of error should target *rulings*, not reasons for rulings. *See* ORAP 5.45(3) (assignments of error must identify the "ruling" that is being challenged).

That said, we address each of the "assignments" as such for ease of reference to the parties' arguments.

## A.   *Assignments One and Two: Subject Matter Jurisdiction*

CRC begins by arguing that the trial court erred in granting the state's summary judgment motion and in denying CRC's motion on the ground that it lacked subject matter jurisdiction because CRC should have sought judicial review of the board's final order in this court. As we have noted, the state concedes that the trial court erred in that regard. We accept the concession. *Boise Cascade Corp. v. Board of Forestry (S42159)*, 325 Or 185, 196, 935 P2d 411 (1997) ("we hold that plaintiff's [inverse condemnation claim] properly

was before the circuit court, because the circuit court and the Board share concurrent jurisdiction").

B. *Assignments Three and Four: Issue and Claim Preclusion*

■ CRC next argues that the trial court erred in granting the state's summary judgment motion and in denying CRC's summary judgment motion on the ground that CRC's claims were subject to issue and claim preclusion. The state again concedes that the trial court erred in that regard, and we again accept the concession.

C. *Assignments Five and Six: Waiver and Estoppel*

CRC argues that the trial court erred in granting the state's summary judgment motion and in denying CRC's summary judgment motion on the ground that CRC had either waived or is estopped from challenging the denial of the third written plan. CRC argues that it has done nothing that would support the conclusion that it affirmatively waived its right to assert a takings claim or that would subject it to an estoppel defense in asserting such a claim. The state responds that, by successfully obtaining a permit to cut timber on 31 of the 40 acres in the Beaver Tract, CRC waived its right to complain about the state's refusal to permit cutting the remaining nine acres. Similarly, the state contends that, by "agreeing" to the 31-acre permit, CRC effectively lulled the state into granting the permit and so should be estopped from now arguing for more. In support, the state cites *L.A. Development v. City of Sherwood*, 159 Or App 125, 977 P2d 392 (1999).

We begin with waiver. The Oregon Supreme Court has explained that waiver is "the intentional relinquishment of a known right" that is "manifested in some unequivocal manner." *Waterway Terminals v. P.S. Lord*, 242 Or 1, 26, 406 P2d 556 (1965).

■ The undisputed record shows that, when confronted with evidence that there was an active bald eagle nest on the Beaver Tract, CRC applied for a permit consistently with the rules then in existence regarding logging in the vicinity of a bald eagle nest. *See* OAR 629-665-0220. Following the end of the nesting season, when CRC had reason to believe that the

nest was no longer active, it applied for permission to cut the rest of the timber. The state does not explain—and we do not understand—how CRC's response to that new information was somehow foreclosed by its prior application. The state cites nothing in the record suggesting that, when CRC submitted its second written plan, it unequivocally manifested an intention to relinquish the right in the future to seek permission to cut the remaining nine acres, much less that it intended to relinquish the right to assert a takings claim. Certainly, nothing in the written plan itself or the state's written approval of the plan says anything like that. We reject the state's argument that CRC waived the right to assert a takings claim.

■      We turn to estoppel. In *L.A. Development*, a developer applied for a permit, which the city granted subject to certain conditions. The developer could have challenged the imposition of those conditions by appealing to the Land Use Board of Appeals, but it did not do so. Meanwhile, following the developer's agreement to the conditions, the city built a storm-water facility and a well within the project. After the project was completed and the developer had turned a profit on the project, the developer asserted an inverse condemnation claim, arguing that the conditions effected an uncompensated taking. The city argued that the developer was estopped from challenging the conditions when the city had relied on the developer's failure to challenge them earlier. We agreed, holding that the developer had obtained the city's approval by forgoing appeal of the imposition of the development conditions. 159 Or App at 129-32.

In this case, CRC submitted a written plan to log 31 acres, and the State Forester approved it. It is not apparent what exactly CRC was supposed to have challenged at that point in the process, much less how the state relied on CRC's failure to assert a challenge in approving the plan. As we have noted, the record shows that CRC submitted the written plan consistently with the rules then in effect and that, when it believed that additional information provided a basis for submitting the third written plan, it did so. This case is not like *L.A. Development*. There is a complete absence of evidence that CRC lulled the state into granting a permit or that

the state relied on a CRC decision to forgo avenues of appeal. We therefore reject the state's argument that CRC is estopped from asserting a takings claim.

In short, the trial court erred in concluding that CRC either waived or is estopped from asserting its takings claims. But, because the trial court nevertheless may have been correct on the merits in dismissing those claims, we turn to the parties' arguments as to the merits.

D. *Eleventh and Twelfth Assignments: State Constitutional Takings Claim*

In its seventh through tenth, thirteenth, and fourteenth assignments of error, CRC argues that the trial court erred in dismissing its federal takings claim. Then, in its eleventh and twelfth assignments, it argues that the trial court erred in granting the state's summary judgment motion and in denying CRC's motion regarding the state constitutional claim. We take the assignments somewhat out of order, addressing the dismissal of the state constitutional claim first. The state argues that we should not address the dismissal of the state constitutional claim at all, because CRC failed to articulate a separate takings analysis under the state, as opposed to the federal, constitution.

1. *Whether to address state constitutional claims*

From the beginnings of the state constitutional revolution, Oregon courts determined that it is always appropriate to consider whether there is a violation of the state constitution before addressing whether there is a violation of the federal constitution. *See, e.g.*, Wallace P. Carson, Jr., *"Last Things Last": A Methodological Approach to Legal Argument in State Courts*, 19 Willamette L Rev 641, 643 (1983) ("The Oregon Rule is first things first.").

The Oregon Supreme Court has explained the justification for the "first-things-first" approach to constitutional interpretation in the following terms:

"The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but because the state does not deny

> any right claimed under the federal Constitution when the
> claim before the court in fact is fully met by state law."

*Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981). Most
of the provisions of the federal constitution pertaining to indi-
vidual rights do not even apply to the states except by incor-
poration through the Due Process Clause of the Fourteenth
Amendment to the United States Constitution. Unless an
individual demonstrates that he or she has been denied a
remedy under state law—including state constitutional
law—he or she has not yet been denied due process, and the
federal constitutional guarantees do not apply as a matter of
federal constitutional law. *State v. Scharf*, 288 Or 451, 454,
605 P2d 690 (1980).

In theory, that should mean that, regardless of
whether the parties have raised a state constitutional claim,
the courts *cannot* entertain a federal constitutional claim
until it has first been determined that state law does not pro-
vide a remedy. And, at least for a while, that is precisely what
the Oregon courts held. In *State v. Clark*, 291 Or 231, 630 P2d
810, *cert den*, 454 US 1084 (1981), for example, the court
addressed an issue of state constitutional law that the appel-
lant actually had disclaimed. The court said that it was obli-
gated to reach the state constitutional issue in all events. *Id.*
at 233 n 1. Similarly, in *State v. Kennedy*, 295 Or 260, 266-67,
666 P2d 1316 (1983), the court rejected the very argument
that the state makes in this case, namely, that the courts are
at liberty to ignore state constitutional law if the parties have
failed to articulate a separate analysis of it.

Since the early 1980s, however, the courts have been
less consistently committed to the first-things-first doctrine.
On the one hand, the courts have adopted a practice of declin-
ing to address state constitutional issues unless they have
been adequately preserved. *See, e.g.*, *GTE Northwest, Inc. v.
Public Utility Commission*, 321 Or 458, 468 n 6, 900 P2d 495
(1995), *cert den*, 517 US 1155 (1996) ("GTE offers no separate
analysis under the state constitution. Accordingly, we
assume, without deciding, that the analysis is the same
under Article I, section 18, of the Oregon Constitution, and
the Takings Clause of the Fifth Amendment to the Constitu-
tion of the United States."); *State v. Riggs*, 143 Or App 427,

430-31, 923 P2d 683 (1996), *rev den*, 325 Or 247 (1997) (declining to address state constitutional claim because appellant did not "clearly present" a distinct method of state constitutional analysis). It is a practice entirely inconsistent with *Sterling*, *Scharf*, *Clark*, and *Kennedy*.

On the other hand, both we and the Supreme Court continue to cite *Sterling*, *Scharf*, *Clark*, and *Kennedy* for the proposition that we *must* decide state constitutional issues before we may reach federal issues. *See, e.g.*, *State v. Joslin*, 332 Or 373, 380, 29 P3d 1112 (2001) (citing *Kennedy* for the rule that the Supreme Court "decides state constitutional issues before deciding federal issues"); *State v. Vasquez*, 177 Or App 477, 481, 34 P3d 1188 (2001) (citing *Kennedy* for the rule that the courts "will reach federal constitutional arguments only if questions of state law are not dispositive").

■ Fortunately, we need not attempt to resolve the apparent inconsistency reflected in those two lines of cases. Before the trial court, CRC asserted its state constitutional claim and argued that, under cases construing Article I, section 18—specifically, *Boise Cascade*—it was entitled to compensation for an unconstitutional taking. The meaning of Article I, section 18, is properly before us.

### 2. *How to address state constitutional claims*

Before turning to the merits of CRC's state constitutional claim, we must address another preliminary issue, concerning interpretive method. In *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), the Supreme Court stated that state constitutional analysis requires an examination of a disputed provision at three levels: (1) its specific wording; (2) the case law surrounding it; and (3) the historical circumstances that led to its adoption. More recently, in *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000), the court explained that the objective of that three-level inquiry is "to ascertain and give effect to the intent of the framers [of the constitutional provision at issue] and of the people who adopted it."

That three-level method of analysis has not been consistently applied, however. Although it has been applied, for example, to Article I, section 17, *e.g.*, *Lakin v. Senco*

*Products, Inc.*, 329 Or 62, 68, 987 P2d 463 (1999), it has never been applied to Article I, section 16, *e.g.*, *State v. Rogers*, 313 Or 356, 380, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993). Similarly, although it has been applied to Article I, section 10, *e.g.*, *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 90-91, 23 P3d 333 (2001), it has not been applied to Article I, section 9, *e.g.*, *State v. Cocke*, 334 Or 1, 6-10, 45 P3d 109 (2002).

That inconsistency can pose problems in cases in which existing case law may be at odds with what the framers likely intended a constitutional provision to mean. This could be such a case.

A number of scholars have suggested that the framers of the takings provision of the federal constitution intended the takings clause of the Fifth Amendment to apply only to physical acquisitions and that the clause was neither intended nor understood to constitute a limitation on legislative authority to regulate the use of property.[1] They

---

[1] *See, e.g.*, Fred Bosselman, *et al.*, *The Taking Issue: A Study of the Constitutional Limits of Governmental Authority to Regulate the Use of Privately-Owned Land without Paying Compensation to the Owners* 104 (1973) ("There is no evidence that the founding fathers ever conceived that the takings clause could establish any sort of restrictions on the power to regulate the use of land."); John F. Beggs, *The Theoretical Foundations of the Takings Clause and the Utilization of Historical Conceptions of Property in the Ecological Age*, 6 Fordham Envtl LJ 867, 870 (1995) ("the [Takings] Clause was not intended to apply to regulatory takings"); J. Peter Byrne, *Ten Arguments for the Abolition of the Regulatory Takings Doctrine*, 22 Ecology LQ 89, 91 (1995) ("Neither the text of the Fifth Amendment nor the circumstances of its adoption suggests that its proponents had any expectation that the Takings Clause would provide an enforceable limitation on government regulation of land use."); John F. Hart, *Land Use Law in the Early Republic and the Original Meaning of the Takings Clause*, 94 Nw U L Rev 1099, 1101 (2000) ("the Takings Clause was originally understood as referring only to appropriation"); John F. Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, 109 Harv L Rev 1252, 1253 (1996) ("The Takings Clause does not expressly address regulation of property, nor does any contemporaneous evidence indicate that it was intended to apply to regulation."); Edward J. Sullivan, *The Taking Issue*, 5 Envtl L 515, 521 (1975) ("An examination of legal history in America and in England shows that the taking clause was specifically addressed to the problem of confiscation, rather than regulation, of property."); William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum L Rev 782, 798 (1995); William Michael Treanor, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale LJ 694, 708 (1985) (the just compensation clause "was to apply only to the federal government and only to physical takings").

Scholarly opinion is not entirely uniform, however. Professor Richard Epstein, for example, argues for a very broad reading of the federal takings clause based not

observed that current regulatory takings doctrine appears to be based on a historical misconception that early American landowners were permitted to use their land freely so long as they caused no harm to others and that, thus, a regulatory takings doctrine simply was not necessary until the advent of twentieth-century zoning and environmental regulations.[2] In fact, those scholars point out, colonial land use regulation was pervasive and implemented purposes other than preventing nuisances. Such regulation included laws regulating aesthetics, drainage, building types, lot sizes and shapes, setback requirements, and vegetation.[3] In addition, late eighteenth-century regulations included requiring private landowners to permit others to conduct mineral or mining operations on their land and to permit strangers to enter to construct dikes, ditches, and fences and to contribute funds for the costs of doing so.[4]

Following the adoption of just compensation clauses by the states in the early nineteenth century, the prevailing view appears to have been that only physical acquisitions were compensable.[5] As a leading commentator concluded in

on any historical evidence about the intentions of the framers or the state of land use regulation in the eighteenth century but on a more nuanced theory that imputes to the framers certain views of John Locke and the Scottish moralists. Richard Epstein, *Takings: Private Property and the Power of Eminent Domain* 7-31 (1985). Others argue that the historical record is simply too "limited" to draw firm conclusions one way or the other about what the framers intended. *See, e.g.,* Andrew S. Gold, *Regulatory Takings and Original Intent: The Direct, Physical Takings Thesis "Goes Too Far,"* 49 Am U L Rev 181, 240-42 (1999).

[2] *See, e.g.,* Morton J. Horowitz, *The Transformation of American Law: 1780-1860* 31 (1992) ("In the eighteenth century, the right to property had been the right to absolute dominion over land[.]").

[3] *See generally* Hart, 94 Nw U L Rev at 1107-19.

[4] *Id.* at 1119-23.

[5] *See, e.g.,* Scott Reznick, *Land Use Regulation and the Concept of Takings in Nineteenth Century America,* 40 U Chi L Rev 854, 857 (1973) ("The doctrine that emerged from these cases was that property had to be taken in a physical sense, and then so completely as to amount to a fee interest, before the owner would be entitled to compensation. This doctrine of compensation prevailed throughout the period from 1825 to 1870.").

In fact, it has been suggested that, in the years before the Civil War, even in cases of outright physical appropriation, actions for damages under the Fifth Amendment were rare; the proper remedy was commonly thought to be invalidation of the legislation under which the taking took place, not an award of damages. *See* Robert Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law,* 52 Vand L Rev 57, 60 (1999) ("The truth, however, is that for most of the nineteenth century, just compensation

1857: "It seems to be settled that, to entitle the owner to protection * * * the property must be actually taken in the physical sense of the word, and that the proprietor is not entitled to claim remuneration for indirect or consequential damage, no matter how serious * * *."[6] It is not until the late nineteenth century, long after the adoption of the Oregon Constitution, that courts began to entertain the idea that the takings clause might apply to something other than a physical acquisition.[7] Thus, it is possible that the framers of the Oregon Constitution would not have understood Article I, section 18, to provide the basis for a claim for "regulatory takings."

Yet, in a number of cases, the courts of this state plainly have recognized the validity of regulatory takings claims under Article I, section 18. In *League of Oregon Cities v. State of Oregon*, 334 Or 645, 665, 56 P3d 892 (2002), for example, the Supreme Court summarized the effect of Article I, section 18, in the following terms:

"That provision requires payment of 'just compensation' for a variety of governmental actions that result in the 'taking' of private property for public use, including 'regulatory' takings by way of application or enforcement of regulations with certain economic ramifications."

---

clauses were generally understood not to create remedial duties, but to impose legislative disabilities.").

[6] Theodore Sedgwick, *A Treatise on the Rules which Govern in the Interpretation and Application of Statutory and Constitutional Law* 519-20 (1st ed 1857). Sedgwick complained that the "settled" rule of physical appropriation was inadequate, as a matter of policy:

"I cannot refrain from the expression of the opinion, that this limitation of the term *taking* to the actual physical appropriation of property or a divesting of the title is, it seems to me, far too narrow a construction to answer the purposes of justice, or to meet the demands of an equal administration of the great powers of government."

*Id.* at 524.

[7] *See generally* Derek Teaney, *Originalism as a Shot in the Arm for Land Use Regulation: Regulatory "Takings" are not Compensable under a Traditional Originalist View of Article I, Section 18, of the Oregon Constitution*, _____ Willamette L Rev _____ , _____ (forthcoming 2004) (tracing early nineteenth-century case law and concluding that framers of Oregon Constitution would have understood that regulatory takings are not compensable under the Oregon Constitution).

Similarly, in *Boise Cascade Corp.*, the court explained that a regulation of use gives rise to a compensable takings claim under Article I, section 18, when the regulation "deprives the owner of *all economically viable use of the property.*" 325 Or at 198 (emphasis in original); *see also Dodd v. Hood River County*, 317 Or 172, 181, 855 P2d 608 (1993) ("zoning regulations that expressly limit the uses that may be made of petitioners' property" may give rise to regulatory takings claim under state constitution); *Deupree v. ODOT*, 173 Or App 623, 630, 22 P3d 773 (2001) ("a regulatory taking under Article I, section 18, occurs only where the property owner is deprived of all substantial beneficial or economically viable use of the property").

In none of the foregoing cases did we or the Supreme Court explain precisely why a regulation may constitute a "taking" of property, much less how such a conclusion conforms to the probable intentions of the framers of the Oregon Constitution. The Oregon courts appear to have simply jumped onto the federal regulatory takings bandwagon that began with the United States Supreme Court's *dictum* in *Penna. Coal Co. v. Mahon*, 260 US 393, 43 S Ct 158, 67 L Ed 322 (1922).

In prior cases, when applying the interpretive approach of *Priest* and *Stranahan* to a state constitutional provision potentially runs afoul of existing Supreme Court case law, we have deferred to that existing case law. *See, e.g., Weber v. Oakridge School District 76*, 184 Or App 415, 430-31, 56 P3d 504 (2002) ("[p]articularly in light of the fact that a more historically oriented interpretive approach has at least the potential to lead to conflicts with well-established rules of law, we are not inclined to attempt to undertake on our own an effort to determine the framers' intentions" with respect to the meaning of the search and seizure provisions of Article I, section 9). We adhere to that approach in this case as the one less directly confrontational in terms of Supreme Court precedent.[8]

---

[8] Among other things, it respects the possibility that (a) the Supreme Court will read the historical record differently or (b) in any event, the court does not intend that *Priest* apply to the interpretation of Article I, section 18.

### 3. *The dismissal of CRC's state constitutional takings claim*

■    CRC contends that, when the state denied its third written plan, it effectively took the remaining nine acres of the Beaver Tract for public use without compensation in violation of Article I, section 18. CRC acknowledges that, under Article I, section 18, a regulation of use does not amount to a compensable taking unless the regulation deprives the owner of "all economically viable use of the property." *Boise Cascade Corp.*, 325 Or at 198 (emphasis omitted). CRC contends that, at least with respect to the nine acres of land that the state will not permit it to log, there is no dispute that the land has no value.

The state argues that CRC misunderstands the appropriate benchmark for the calculation of diminution in value. According to the state, the diminution in value must be determined with respect to the "whole parcel," that is, the entire 40-acre Beaver Tract. Viewed in that light, the state argues, it becomes clear that CRC has not been deprived of *all* economically viable use of the property. It has, in fact, been permitted to make presumably profitable use of fully three-quarters of the parcel.

The issue thus framed raises the question whether the Oregon courts follow what is known as the "whole parcel rule."[9] The problem dates back at least to *Penna. Coal Co.* itself. In that case, the United States Supreme Court held that a state statute prohibiting subsurface coal mining went "too far" and amounted to an uncompensated taking of property. 260 US at 414-16. Justice Brandeis dissented, arguing that,

---

[9] The issue is also known as the "denominator problem" by those who express the issue in mathematical terms, *i.e.*, the loss of the property interest taken is expressed as a numerator of a fraction, while the value of the property interest as a whole, including the property remaining, is the denominator. Depending on whether the "property," the value of which constitutes the denominator of the fraction, refers narrowly to the property subject to the regulation or more broadly to include any other property interests, the resulting fraction—and the result in terms of whether there is a taking of property—can be very different. *See, e.g.*, John E. Fee, *Unearthing the Denominator in Regulatory Taking Claims*, 61 U Chi L Rev 1535, 1536 (1994); Marc R. Lisker, *Regulatory Takings and the Denominator Problem*, 27 Rutgers LJ 663, 666-68 (1996).

> "[i]f we are to consider the value of the coal kept in place by the restriction, we should compare it with the value of all other parts of the land. That is, with the value not of the coal alone, but with the value of the whole property."

*Id.* at 419 (Brandeis, J., dissenting). Since then, the United States Supreme Court has rather exasperatingly wandered back, *see, e.g.*, *Penn Central Transp. Co. v. New York City*, 438 US 104, 130-31, 98 S Ct 2646, 57 L Ed 2d 631 (1978) (" 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated."), and forth, *see, e.g.*, *Kaiser Aetna v. United States*, 444 US 164, 179-80, 100 S Ct 383, 62 L Ed 2d 332 (1979) (recognizing that loss of only the right to control public access to private property is compensable under the takings clause), and back again, *see, e.g.*, *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 US 302, 327, 122 S Ct 1465, 152 L Ed 2d 517 (2002) ("even though multiple factors are relevant in the analysis of regulatory takings claims, in such cases, we must focus on the 'parcel as a whole' "). Scholars and courts have struggled to make sense of the cases. *See, e.g.*, Daniel R. Mandelker, *New Property Rights Under the Taking Clause*, 81 Marq L Rev 9 (1997) (tracing the history of the "segmentation muddle").

By comparison, although the Oregon courts have not been exactly generous in their explanations, they at least have been consistent in their treatment of the whole parcel rule. In a nutshell, they have effectively rejected it.

In *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 581 P2d 50 (1978), the owner of approximately 20 acres of undeveloped land complained about the effect of a local zoning ordinance that designated various smaller parcels within the 20-acre tract as "medium density residential," "neighborhood commercial," "greenway area," and "transit station." The designations interfered with the owner's plan to develop the tract as a regional shopping center. When the owner applied for a permit to build the shopping center, the county denied the application on the ground that the use was not allowed under the zoning ordinance. The owner then brought an action for, among other things, damages for a regulatory

taking. The trial court sustained a demurrer to the complaint. *Id.* at 593-95.

In affirming the trial court, the Supreme Court first explained that "we must divide the subject property into two separate parcels," namely, the bulk of the property that was designated "commercial" and "residential" and the balance that was designated either "transit station" or "[g]reenway." *Id.* at 609. The court then addressed whether the trial court correctly had dismissed the regulatory takings claim with respect to each of the separate parcels within the 20-acre tract. In that context, that is, in addressing each of the separate parcels, the court examined whether the zoning ordinance had deprived the owner of all beneficial use of its property. *Id.* at 609-14.

In *Boise Cascade Corp.*, both we and the Supreme Court applied the same segmentation principle in evaluating the legal sufficiency of a regulatory takings claim. In that case, Boise Cascade, the owner of a 64-acre tract of timber land known as the Walker Creek Unit, submitted a written plan to log the site. The Department of Forestry denied the plan. In doing so, it identified a 56-acre parcel within the Walker Creek Unit as a spotted owl habitat that could not be logged at all. The board upheld the decision. Boise Cascade then submitted a written plan to log four of the acres that the department previously had agreed could be harvested. The department, and later the board, approved the plan subject to a condition that logging could occur only during a four-month window. Boise Cascade initiated an inverse condemnation action, alleging that the board's decisions deprived it of all economically viable use of the 56-acre parcel and temporarily imposed a taking of the four-acre parcel. The trial court dismissed the action on a number of grounds, including that the complaint failed to state a claim.

On appeal to this court, Boise Cascade argued that the trial court erred in dismissing the regulatory takings claim. The state, citing *Penn Central Transp. Co.*, responded with the argument that, under the whole parcel rule, the trial court's ruling was correct. According to the state, Boise Cascade had suffered no unlawful taking, because "it may conduct logging operations on the timber growing outside the

protected area," that is, on the remaining acres in the tract. We reversed, rejecting the state's whole parcel argument. We concluded that the complaint had stated two claims:

"[T]hat there has been a taking of the 'core' area of its property [the 56-acre parcel] and that there has been a temporary taking of the four-acre tract that was subject to the board's 'temporal' restriction on logging. In both contexts, plaintiff alleges, in essence, that the government has regulated its property in such a way that productive uses are unavailable and all viable economic and beneficial use has been eliminated. Those allegations suffice to state regulatory taking claims under both [state and federal] constitutions as to the principal part of the property [the 56-acre parcel] and a temporary taking of the four-acre part."

*Boise Cascade Corp. v. Board of Forestry (A79626)*, 131 Or App 538, 551, 886 P2d 1033 (1994).

On review, the Supreme Court affirmed in part and reversed in part. As previously noted, the court described the relevant standard for evaluating regulatory takings under Article I, section 18, as whether "[t]he property owner must show that the application of the government's [regulation] deprives the owner of *all economically viable use of the property.*" *Boise Cascade Corp.*, 325 Or at 198 (emphasis in original). The court then turned to the first of the two claims, involving the 56-acre portion of the Walker Creek Unit:

"With respect to the first claim for relief, the plaintiff has alleged 'depriv[ation] * * * of the only economically viable use of approximately 56 acres of merchantable timber.' Assuming the truth of all well-pleaded facts alleged in the complaint and giving plaintiff the benefit of all favorable inferences that may be drawn from those facts, that allegation is sufficient to meet the 'deprivation of all economically viable use of the property' standard. The Court of Appeals was correct in so holding."

*Id.*

Turning to the second of the two claims, involving the temporary taking of the four-acre portion of the larger tract, the court held that we had erred in concluding that the allegations were legally sufficient. *Id.* at 200. The court held that the Oregon Constitution recognizes a regulatory taking

when the denial of all economic use "either is permanent on its face or so long lived as to make any present economic plans for the property impractical." *Id.* at 199. Thus, in examining the legal sufficiency of both claims, the court took each parcel separately from the larger whole of which it was a part, examining only the individual portions of the owner's property that were subject to the use restrictions without reference to the use or value of the property as a whole.

To be sure, the court did not expressly label its decision as a rejection of the principle labeled the "whole parcel rule." Moreover, the Supreme Court has never explained—neither have we, for that matter—why segregating affected parcels, as opposed to applying the whole parcel rule, is required under Article I, section 18. Indeed, the Supreme Court's decision in *Boise Cascade Corp.* has been taken to task for so "casually glid[ing] over" many significant legal issues in that case. *See, e.g.*, Shaye Diveley, *Boise Cascade Corp. v. Board of Forestry: The Oregon Supreme Court Opens the Door for Successful Takings Claims under the Endangered Species Act*, 8 Hastings W-Nw J Envtl L & Pol'y 27, 28-30 (2001) (court's decision "effectively ignored the whole parcel rule" without explanation). The fact remains, however, that the court rejected the state's argument that the "whole parcel rule" applied.

The state insists that we should not read *Boise Cascade Corp.* to have repudiated the whole parcel rule because the court "did not mention, let alone discuss, distinguish, modify or repudiate the relevant parcel principles" set forth in recent *federal* takings case law. The state suggests that we should not lightly assume that the Supreme Court "for the first time" held "that Article I, [section] 18[,] differed substantively from the Fifth Amendment."

To begin with, the courts of this state do not operate under a presumption that parallel provisions of state and federal constitutions have identical meanings. Moreover, although it is true that the Oregon courts in some cases have *assumed*, without deciding, that the state and federal takings clauses have identical meanings, *see, e.g.*, *Stevens v. City of Cannon Beach*, 317 Or 131, 135 n 5, 854 P2d 449 (1993) ("Because plaintiffs have not made a separate argument

under the state constitution, we will assume for purposes of this case, without deciding, that the analysis would be the same under the Oregon Constitution."), none ever has held that the two clauses *must* have the same meaning. To the contrary, in *Suess Builders Co. v. City of Beaverton*, 294 Or 254, 259 n 5, 656 P2d 306 (1982), the Oregon Supreme Court explained that, although the "basic thrust" of the two provisions is "generally the same," the two provisions "are not necessarily identical." In fact, contrary to the state's suggestion, the Oregon courts have for many years construed Article I, section 18, to afford different protections to property owners than does the Fifth Amendment. *See, e.g., Dodd*, 317 Or at 181-82 (rejecting suggestion that Article I, section 18, regulatory takings analysis should conform to federal case law).

We therefore reject the state's argument that the whole parcel rule applies. That means that the sole remaining issue is whether there is a genuine issue of material fact as to whether the restriction on CRC's ability to log the remaining nine acres of the Beaver Tract has deprived it of all economically viable use of that parcel. The state apparently does not dispute CRC's assertion that the restriction does, in fact, deprive the nine-acre parcel of all economically viable use. It necessarily follows that CRC has established the requisites of its regulatory takings claim under Article I, section 18. The trial court therefore erred in granting the state's motion for summary judgment and in denying CRC's motion on the state takings claim.

E.   *Remaining Assignments: Federal Takings Claim*

CRC's remaining assignments of error concern the trial court's decision to grant the state's motions for summary judgment, and to deny CRC's motions, on the federal takings claims. Because we have determined that the trial court erred in dismissing the state takings claims, however, it is not necessary for us to address the dismissal of the federal claims.

Reversed and remanded with instructions to grant plaintiff's motion for summary judgment.